COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-01-159-CV

 

 

ROBERT MORRELL AND DONNA                                          APPELLANTS

MORRELL,
INDIVIDUALLY AND AS

NEXT
FRIENDS OF MADELINE MORRELL,

A
MINOR

 

V.

 

MARY ANGELINE FINKE,
M.D., OBSTETRICAL &                       APPELLEES

GYNECOLOGICAL
ASSOCIATES OF ARLINGTON,

ARLINGTON
MEMORIAL HOSPITAL FOUNDATION, 

INC.
D/B/A ARLINGTON MEMORIAL HOSPITAL, ROSE

FENTON,
R.N.C., SANDY STEPHENS, R.N., AND

MARIANNE
WALKER, R.N.

 

 

AND

 

 

MARY ANGELINE FINKE,
M.D. AND OBSTETRICAL &       APPELLANTS 

GYNECOLOGICAL
ASSOCIATES OF ARLINGTON

 

V.

 

ROBERT MORRELL AND DONNA                                             APPELLEES

MORRELL,
INDIVIDUALLY AND AS

NEXT
FRIENDS OF MADELINE MORRELL,

A
MINOR

 

AND








 

ARLINGTON
MEMORIAL HOSPITAL FOUNDATION,                
APPELLANTS

INC.
D/B/A ARLINGTON MEMORIAL HOSPITAL, ROSE

FENTON,
R.N.C., SANDY STEPHENS, R.N., AND

MARIANNE
WALKER, R.N.

 

V.

 

ROBERT MORRELL AND DONNA                                             APPELLEES

MORRELL,
INDIVIDUALLY AND AS

NEXT
FRIENDS OF MADELINE MORRELL,

A
MINOR

 

                                              ------------

 

            FROM
THE 17TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

I.  Introduction













Donna Morrell gave birth to
her first child, Madeline, on December 31, 1994, at Arlington Memorial
Hospital.  Donna and her husband, Robert
Morrell, individually and as next friends for Madeline (Plaintiffs), brought
suit alleging that Madeline suffered permanent neurological injuries
proximately caused during labor and delivery by the negligence of Defendants
Mary Angeline Finke, M.D.; Dr. Finke=s employer, Obstetrical & Gynecological Associates of Arlington,
Inc. (the clinic); Rose Fenton, R.N.C., Sandy Stephens, R.N., and Marianne
Walker, R.N. (the nurses); and their employer, Arlington Memorial Hospital
Foundation, Inc. (the hospital), collectively Defendants.  After a five-week trial, the jury returned a
verdict for Plaintiffs and against all Defendants.[1]
The trial court granted a judgment notwithstanding the verdict (JNOV) on the
jury=s $500,000 damage award to Donna and Robert for mental anguish and on
the jury=s $2,000,000 damage award to Donna and Robert for loss of
consortium.  Plaintiffs appeal from the
JNOV.  Dr. Finke, the clinic, the nurses,
and the hospital appeal from the judgment against them, challenging both
liability and damages.  For the reasons
discussed below, we will modify the trial court=s judgment to delete the imposition of joint and several liability
upon the nurses for the jury=s award of past medical expenses to Robert and Donna Morrell
individually and render judgment that Robert and Donna, individually, recover
nothing from the nurses on their claim for past medical expenses because that
claim is barred by the statute of limitations. 
We will also modify the trial court=s judgment to delete the imposition of joint and several liability
upon Rose Fenton, R.N.C. because the jury found her only five percent
proportionally responsible.  As modified,
we will affirm the remainder of the trial court=s judgment, including the JNOV on the Morrells= mental anguish and loss of consortium claims.

II.  Factual and Procedural Background

A.  Admission to Hospital

Donna=s water broke in the early hours of December 31, 1994.  Her husband, Robert, drove her to the
hospital, where she was admitted to the labor and delivery unit at 8:45
a.m.  Both sets of the baby=s grandparents arrived soon thereafter.  Upon Donna=s arrival, the nurse on duty drew blood for laboratory analysis,
attached an external fetal monitor to record the baby=s heartbeat, started an intravenous line, performed a cervical
examination, and prepared Donna for labor.[2]  

B.  Fetal Heart Monitor Strip








Experts testified that a baby=s heart rate is monitored during labor as a means of assessing the baby=s oxygenation, including oxygenation of the baby=s brain.  A fetal heart monitor
strip is read at regular and frequent intervals to determine whether the baby=s heart rate reflects Ahypoxia,@ a defiency
of oxygen reaching the tissues of the body that could lead to depletion of the
baby=s oxygen reserves over time, resulting in brain damage.  

A fetal heart monitor strip
will be either Areassuring@ or Anonreassuring.@ In fact, the hospital=s AFetal Heart
Monitoring Policy (Nurses Responsibility)@ provides that fetal heart A[p]atterns will be classified as either reassuring or
nonreassuring.@ [Emphasis
added.]  AONE[3]
standards as well as the hospital=s fetal heart monitoring policy define Aaccelerations@ as
increases in the baby=s heart beat
of fifteen beats per minute lasting fifteen seconds.  Following a contraction, accelerations are Areassuring@ by showing that
the baby is oxygenated and tolerating labor.  ABeat-to-beat variability@ is defined as follows by the hospital=s fetal heart monitoring policy:

Short
Term Variability (beat to beat) - Is most accurately determined by internal
spiral electrode.  This aspect of patient
monitoring is the most indicative of fetal well-being and response to stressors
of labor.  Please document as:

 

Present = 3 bpm or greater

Absent = < 3 bpm

 








Thus, a normal variation of three beats per
minute or more in the fetal heart rate is a reassuring sign of fetal
well-being, indicating that the baby>s brain is responding to oxygenation. 
A less than three-beat-per-minute variation in the baby=s heart rate documents that beat-to-beat variability is Aabsent@ and
constitutes a nonreassuring pattern. 

The fetal heart monitor strip
will also show Adecelerations,@ (decels) in the baby=s heart rate that may be early, variable, or late.  Early decels occur with a contraction and
indicate a benign pattern.  Variable
decels, variable in shape rather than uniform in pattern, may also occur during
the contraction.  Variable decels are
generally caused by umbilical cord compression and are indicative of decreased
oxygenation to the baby.  Late decels
document a deceleration of the baby=s heart rate beginning at or after the midpoint of a contraction.  Late decels are indicative of placental
insufficiency, meaning that the baby is not being perfused well by the
placenta.  








Babies have stored oxygen in
cells throughout their bodies called Afetal reserves.@  Severe, prolonged, variable, or late
decelerations are Anonreassuring@ and are considered Aominous@ if they
become Arepetitive@ because
every late or variable decel presents the possibility of depleting fetal
reserves, depending on the degree of the insult.[4]  Experts testified that, over time, chronic or
repetitive decels are nonreassuring because they deplete fetal reserves and
make the baby less able to tolerate each successive insult.     Madeline=s fetal heart monitor strip began at approximately 8:45 a.m., tracing
her heart rate from the external fetal heart monitor.  At approximately 9:40 a.m., Dr. Finke applied
a fetal scalp electrode to Madeline=s head to monitor her heart rate more accurately.  Experts testified that Madeline=s fetal heart monitor strip tracings were nonreassuring from the start
because she had no heart rate Aaccelerations@ as that
term was defined by the hospital fetal heart monitoring policy and, also
according to the policy, beat-to-beat variability was Aabsent.@ 

C.  Morning

Because Madeline=s fetal heart monitor strip was nonreassuring, nurses began an IV on
Donna and turned her onto her left side. 
Madeline=s strip
still did not become reassuring.  Dr.
Finke, the obstetrician on call for the clinic at the hospital that New Year=s Eve, first saw Donna at 9:40 a.m. 
Dr. Finke reviewed the prenatal records, took Donna=s medical history, examined the fetal heart monitor strip, performed a
cervical examination, and determined the baby=s orientation by sonogram.  The
baby was full-term at an estimated eight pounds and active, the amniotic fluid
was clear with no bleeding, and Donna was having irregular contractions. 








Dr. Finke confirmed from her
examination that Donna=s pelvis was
adequate for vaginal delivery, and she anticipated a vaginal delivery with the
alternative of a cesarean section if maternal or fetal indications were
present. At 10:00 a.m., Dr. Finke formulated her plan to administer Pitocin to
stimulate uterine contractions if no further cervical dilation occurred within
two hours. She wrote orders for lab work, Pitocin, an antacid, and pain and
antinausea medication if needed.

Donna=s cervix was dilated only one of the ten centimeters necessary for
delivery, with the baby in a head-downward position at a minus two station in
the birth canal at 8:45 a.m.  Dr. Finke=s examination revealed that the fetus had progressed to a minus one
station at 10:00 a.m.  AStation@ refers to the
position of the baby=s head as it descends in the birth canal,
with reference to the ischial spines. 
Dr. Finke used a five-point system for measuring the station by
centimeters, ranging from Aminus five@ centimeters
above, to Aplus five@ below the ischial
spines.  The
nurses= method for measuring stations was purportedly different from Dr.
Finke=s, and this difference would generate a factual dispute at trial.








At 11:00 a.m., Nurse Marianne
Walker came on duty as the labor and delivery nurse assigned to Donna.  By 11:15 a.m., the variable decelerations in
Madeline=s heartbeat started to widen out and deepen, meaning that it was
taking her heart longer to return to baseline. 
At 12:05 p.m., Nurse Walker began administering Pitocin, as Donna was
still not in active labor and dilation of her cervix was not progressing.  By 12:40 p.m., Donna was dilated to two
centimeters, and the baby was making some progress.  

D.  Afternoon

Dr. Finke next saw Donna at
2:00 p.m., performed a vaginal exam, and placed an intrauterine pressure
cannula to better assist in evaluating the frequency and intensity of Donna=s contractions.  Donna had four
to five contractions lasting fifty seconds in a ten-minute span.  Dr. Finke ordered the Pitocin continued, and
Nurse Walker increased the Pitocin dosage to nine milligrams.  According to the hospital=s records, Dr. Finke did not enter Donna=s room again during the next five hours, until 7:00 p.m. 








At approximately 3:10 p.m.
and 3:13 p.m., the fetal heart monitor strip documents several late decels, one
of them showing a sudden drop in Madeline=s heart rate from 130 beats per minute down to 60 beats per
minute.  According to Nurse Corrine
LaMont, Plaintiff=s nursing
expert, this portion of the strip indicates Aa fetus that=s having a
hard time coping to get back up to the baseline. . . . It indicates that the
baby is having a hard time and is losing its reserves and is being stressed
more than it can tolerate.@  Additionally, Donna=s uterus had become hyperstimulated by the Pitocin increase, and she
experienced nine contractions in ten minutes. 
The nurses and doctors agreed that a hyperstimulated uterus decreases
oxygen to the baby.          

At 3:25 p.m., Nurse Walker
turned off the Pitocin and gave Donna oxygen. 
She notified Dr. Finke of Donna=s status at 3:30 p.m.  From 3:30
p.m. to 4:30 p.m., the strip documents continued variable and late decels, with
no accelerations or beat-to-beat variability. 
Nurse Walker restarted the Pitocin at a lower level at 4:10 p.m.  At 4:20 p.m., an anesthesiologist began an
epidural anesthesia.  At 4:40 p.m., the
strip shows a late decel lasting for over a minute.  Nurse LaMont explained that the increasing
length of time it was taking for Madeline=s heart to return to baseline indicated that she was losing her
ability to recover, that she was being stressed, and that she had suffered so
many insults that Ait [was]
taking [her] longer and longer to fight back.@  Donna=s uterus again became hyperstimulated by the Pitocin; she experienced
seven contractions in ten minutes, ensuring a problem with Madeline=s oxygenation.  Following a
deceleration, lasting over ninety seconds, Nurse Walker turned the Pitocin off
again.








Dr. Finke=s 4:50 p.m. progress note indicated that the baby was still at zero
station and that moderate variable decels were occurring, some after
contractions.[5]  But Donna=s cervix was now dilated seven to eight centimeters, so Dr. Finke=s plan at that time was to continue to monitor Donna and to
discontinue the Pitocin because of Donna=s increased contractions.  Dr.
Finke testified that in her opinion, there was still no contraindication to
proceeding with a vaginal delivery.

E.     Evening

At 4:59 p.m., the fetal heart
monitor strip documented another severe Abiphasic@
deceleration followed immediately by another deceleration before a return to
baseline was achieved.  Dr. Finke agreed
that this tracing was Asignificant@ because, if it became repetitive, it would be a sign that the baby
was not tolerating labor.  Another severe
decel followed, and it took Madeline=s heart approximately four minutes to reestablish some sort of
baseline.  Another decel immediately
followed; Madeline=s heart took
over a minute to return to baseline.  The
strip showed decelerations that were becoming deeper, longer, and more
frequent. 








Experts testified that by
5:15 p.m., the fetal heart monitor strip documented Amarked variability@ in the decelerations, some lasting eighty seconds.  AMarked variability@ is significant because it means the baby is having a hard time
compensating and is using more reserves. 
By 5:20 p.m., the strip showed a pattern of repetitive late
decelerations, a nonreassuring, Aominous sign,@ requiring
intervention. 

Nurse Walker conducted
vaginal exams at 5:10 p.m. and again just before 6:00 p.m., revealing that
Donna=s cervix was dilated to nine centimeters.  During this time, the strip shows that
Madeline continued to experience decels; one lasting almost three minutes.  Nurse LaMont explained that at this point,
every prolonged deceleration constituted an insult to the baby, causing the
baby to lose its reserves.  The fetal
heart monitor strip was becoming more and more alarming; the decelerations were
getting deeper, longer, and slower to return to baseline, documenting that the
baby was developing more and more of an oxygen deficit.  








At 6:30 p.m., the nurses had
Donna try Apushing@ a few times to help complete the cervix=s dilation and move her to the second stage of labor, but the efforts
were unsuccessful.  As Donna attempted to
push, Madeline experienced another prolonged deceleration followed by an
increase in her heart rate to thirty beats per minute over baseline.  The spike in Madeline=s heart rate constituted another nonreassuring sign, according to
Nurse LaMont, because Aas your
oxygen supply gets deleted, your heart beats faster because it=s trying to make up in quality with quantity of getting oxygenated
blood through.@  By 6:45 p.m., Donna=s contractions were becoming stronger and closer together.  The strip continued to document
nonreassuring, deeper, longer, and more frequent decels.  At trial, Dr. Finke explained the increase in
variability and number of decels on the fetal heart monitor strip between 6:00
p.m. and 7:00 p.m. was normal because Donna had moved into the pushing phase of
labor.         Shortly
before 7:00 p.m., Nurse Walker gave Dr. Finke a report on the mother=s and the baby=s status,
and at 7:00 p.m., Dr. Finke examined Donna. 
Dr. Finke determined that the baby had moved past the posterior rim of
the cervix, although not the anterior rim. 
Dr. Finke determined that the baby was making some progress but was in
an occiput transverse (OT) position, at an angle that would make negotiation of
the birth canal difficult.  Dr. Finke
attempted to rotate Madeline to the preferred occiput anterior (OA) face-down
position but was unable to do so and rotated her, instead, to the less
preferred occiput posterior (OP) face-up position.  Dr. Finke noted that the baby continued to have
variable decels but said these were caused by her efforts to turn the baby and
did not concern her. 








From 7:00 p.m. on, for the
last hour of Donna=s labor, the
nurses stopped charting Donna=s and Madeline=s care.  The last chart entry concerning the station
Madeline had progressed to documents Madeline at the zero station.  The fetal heart monitor strip shows another
severe decel occurred at 7:10 p.m., but Dr. Finke explained it was not a decel
that was of concern to her because it occurred when the linen on Donna=s bed was changed.  At 7:20
p.m., Donna became fully dilated and completely effaced, and the nurse began
having her push.








After Dr. Finke examined
Donna and rotated the baby at approximately 7:00 p.m., she was called across
the hall to deliver another baby.  That
baby, delivered by forceps, was born healthy at 7:10 p.m.  The medical professionals, both doctors and
nurses, agreed that the A7:10 p.m.
baby=s plan of delivery@ should not dictate or have any effect on Madeline=s plan of delivery.  Nurse Rose
Fenton[6]
explained that if two babies needed Dr. Finke=s attention at the same time, the nursing standard of care does not
permit the nurses to simply wait for Dr. Finke to become available.  The standard of care requires the nurses to
proceed with finding another doctor:  the
nurses would have called the house supervisor and said, A>We have a situation, I need two doctors, there=s only one here,= [and] the
emergency room doctor could have come up.@   At 7:15 p.m., while Dr. Finke
was still out of Donna=s room, the
fetal heart monitor strip recorded another severe prolonged variable decel down
to 60 beats per minute for forty seconds, followed by tachycardia, with a spike
in the heart rate to 180.  Dr. Finke
testified that this decel would have caught her attention, but explained that
Donna was pushing by this time and said that she did not give the same credence
to decelerations occurring in the pushing phase of labor as she did to those
occurring during the active phase of labor. 
Each time Donna pushed, a severe prolonged decel occurred: Madeline=s heart rate dropped to 50 beats per minute for over a minute with
each decel.  At 7:25 p.m., Madeline was
still at zero station, according to a nurse=s note. 

F.      Delivery

Dr. Finke returned to Donna=s room at 7:35 p.m., in time to see another severe prolonged variable
decel at 7:40 p.m.  Donna=s mother, Sally Ellis, was in the labor and delivery room and
testified that Dr. Finke said:  AOh boy, she=s got my
attention.  Let=s get her out now.@  Dr. Finke performed a pelvic
examination and determined that she needed to take action.  She testified that at 7:50 p.m., she decided
to proceed with a vaginal forceps delivery because of the severe prolonged
decels.  








Dr. Finke testified that,
having determined that the baby had by then progressed to the plus one station
and was low enough in the birth canal, she felt comfortable that the baby was
about to progress to plus two station, and she could not predict whether
further prolonged decels would occur. 
Dr. Finke described the 7:40 p.m. decel as the Aend point@ of her
decision for action and agreed that there was Aurgency@ because of
the large decels. 

Preparation for delivery
included making warm towels and oxygen available for the baby, getting the
delivery table ready, removing the catheter and monitor, scrubbing, removing
the end of the bed and putting stirrups in place, and placing the mother=s legs in the stirrups.  Dr.
Finke described how she would have first evaluated the station, felt the baby=s head, Aghost[ed]@ placement of the forceps outside the mother=s body, and then placed each blade with one hand while guiding it into
place beside the head with the other.   Dr.
Finke applied the forceps at approximately 8:00 p.m.  She testified that she would have held the
forceps with two fingers of one hand on the handles, placed her other hand on
top for a downward pressure to move the head under the pubic bone, and followed
with an upward movement of the head to complete its negotiation out of the
birth canal. 








Donna=s mother, Mrs. Ellis, and Donna=s husband, Robert, observed the delivery.  Mrs. Ellis described Dr. Finke as turning her
body Alike this@
(demonstrating), putting her leg Aup against the bed like this@ (again demonstrating), and Apull[ing] a lot@ and Awith a lot of force.@  She said Dr. Finke Aturned to the side and braced herself.@  Mrs. Ellis testified that Dr.
Finke was pregnant and that her stomach was very large.  She said Dr. Finke pulled with such force
that Ait scared me to death.@  She also said that it was like
a Atug-of-war.@  Robert testified that Dr. Finke shifted her
weight and put one foot Ain front of
the edge of the bed@ and started
Atugging on her [Madeline] as hard as she could.@ Then, he said, Dr. Finke Abraced her foot on the end of the bed.@  Robert testified that Madeline
came out face-up; he could see Madeline=s eyes pulled back by the forceps and her neck distended.  He said Dr. Finke Acouldn=t have
pulled her eyes back any further . . . . 
I thought her head was going to pop.@  He could see Dr. Finke Astraining@ and that
Madeline was Aall bloody@ and bruised.  Dr. Finke
testified that she used Agentle
traction@ to deliver Madeline.








As Madeline=s head emerged, a complication referred to as a Ashoulder dystocia@ developed, meaning that one of the baby=s shoulders became stuck behind the pubic bone.  Dr. Finke had two standard maneuvers
performed to free Madeline=s shoulder quickly.  Using the AMcRoberts@ maneuver,
the nurse pulled Donna=s legs up to
her chest to straighten the pelvis, and then she applied Asuprapubic pressure@ by downward vertical pressure of her doubled fist on Donna=s abdomen.[7]  The shoulder was released in seconds, and
Madeline was born at 8:06 p.m.  Also at
8:06 p.m., Dr. Finke obtained some cord blood from Madeline to determine
Madeline=s blood type and to test for compatibility with Donna=s blood.  An analysis of this
cord blood sample showed Madeline=s pH to be 7.32.[8]  Dr. Finke=s labor and delivery summary described the birth as a Alow forceps delivery@ for Asevere
variable decels.@ 

G.     Condition at Birth

Madeline did not start
breathing upon delivery.  She had
bruising on her face and head with an indentation and a cut described by her
father and grandmother as a Abig gash@ near her
left temple.  This wound to
Madeline=s skull was so
severe that it eventually required debridement. 
Madeline also had extensive bruising over her
entire body.  








While Dr. Finke delivered the
placenta and performed an episiotomy to repair a third-degree tear of Donna=s vagina that extended into the rectal muscle, Nurse Walker began Abagging@ Madeline,
placing a mask over Madeline=s face, and pushing oxygen into her lungs using a squeeze valve.
Within two minutes of birth, the neonatal intensive care unit (NICU) was also
called Astat@ to send a
team to the delivery room.  

Nurse Walker assigned
Madeline a one-minute Apgar score of two. AApgar@ scores are
assigned based upon heart rate, respiration, muscle tone, reflex, and skin
color on a scale of zero to ten and measure a newborn=s ability to adapt to extra-uterine life immediately after birth, at
five minutes, and continuing until at least a score of seven is achieved.  Madeline was given a one for heart rate, a
zero for respiration, a one for muscle tone, a zero for reflex, and a zero for
skin color.  By four minutes, Madeline
was switched to one hundred percent Ablowby@
oxygen.  Nurse Walker assessed her
five-minute Apgar score at six. 

Upon arrival of the NICU
team, Madeline was still pale and blotchy peripherally but was centrally Apink.@  The NICU nurse=s note in Donna=s labor and
delivery report states that Madeline=s Arespirations
were agonal@[9] when the team arrived. 
Consequently, the NICU team resumed Abagging@
Madeline.   Madeline was given briefly to
Donna to hold and then transported to the NICU under the one hundred percent
blowby oxygen.

 








H.     Treatment in NICU

Dr. Scott Tisdell, a board
certified neonatologist and director of the hospital=s NICU, was called to treat Madeline at 8:20 p.m because NICU nurses
were concerned that she might have a skull fracture on the left side of her
head from the forceps.  Dr. Tisdell noted
in his report of his examination of Madeline that A[t]here=s a moderate
indentation on the left side where the forceps were placed.@  He noted that Madeline had
bruising in her right ear, bruising on her scalp and on the right and left
sides of her head.  Dr. Tisdell also
noted that Madeline was developing unusual, extensive bruising on her head,
ears, arms, and even her genitals.  Tests
later also revealed hematomas (internal bleeding) in her liver and adrenal
gland.  Based on the indentation on the
left side of Madeline=s head and
the bruising on her skull and in her ear, Dr. Tisdell was concerned that
Madeline may have suffered a skull fracture and intracranial hemorrhage.  Dr. Tisdell ordered a CT scan, which ruled
out that possibility.








Dr. Tisdell evaluated
Madeline=s oxygen status, perfusion, and degree of respiratory distress,
examining her color, appearance, and breathing, and drawing his own arterial
blood gas sample.  Dr. Tisdell drew his
arterial blood sample from Madeline twenty-four minutes after her birth, and it
established that at that time her pH was 7.219. 
In his opinion, the pH reading from his blood gas sample indicated
Madeline was Aacidotic.@[10] 

Dr. Tisdell concluded that
Madeline=s perfusion was not good and that she was in moderate respiratory
distress.  Her breathing was labored
enough that Dr. Tisdell thought she needed to be intubated; therefore, he
intubated Madeline and administered bicarbonate to correct the acidosis.  He also ordered packed red blood cells,
Plasmanate, and fresh frozen plasma administered to Madeline in an amount equal
to approximately one-third of her total blood volume to replace the blood she
had lost during delivery from the developing hematomas and bruising.








Dr. Tisdell was also
concerned with infection, based upon Madeline=s temperature.  Her rectal
temperature was above 102 degrees, high for a newborn.  He started Madeline on antibiotics, but he
discontinued them after a few days when the cultures he ordered to test for
various infections all came back negative. 
Further tests ruled out genetic metabolic abnormality, meningitis, and
encephalitis.  Madeline=s breathing tube was removed on day three.  Except for his continued opinion that
Madeline had a subclinical infection and an episode of Aapnea@ (described as
the Ababy forgetting to breathe@) on day nine, Dr. Tisdell testified that everything else had
resolved, including the hematomas in Madeline=s liver and adrenal gland.  Dr.
Tisdell discharged Madeline on the thirteenth day, sending her home with a
monitor for apnea and CPR training for her parents. 

I.      Alleged Damages

At home, Madeline choked
easily during feedings and had to be held to prevent her from vomiting.  She slept with the monitor for fifteen
months.  She failed to progress as a
normal child.  She was unable to walk
without the aid of a walker until age three. 
At age two and a half, Madeline was diagnosed with cerebral palsy with
developmental delay. 

Madeline has an IQ of
forty-eight; she is mentally retarded. 
At the time of trial Madeline was seven years old and was not toilet
trained.  She still experiences
difficulty walking; her right leg becomes tired and drags.  When she becomes tired, her right eye becomes
cross-eyed.  She has many other motor,
learning, and behavioral disorders.  The
indentation on Madeline=s left
temple from the forceps is still present and visible, causing her face to lack
symmetry and her glasses to not fit properly. 
Madeline will require extensive special education, therapies, and
counseling.  She will never be capable of
independent living.

 








J.  Verdict and Judgment

After both sides rested and
closed, the trial court granted the hospital and clinic a directed verdict on
Plaintiffs= direct
negligence claims.  In answer to a
broad-form submission, the jury found that the negligence of each of the
remaining individual Defendants was a proximate cause of Madeline=s injuries and apportioned liability sixty percent to Dr. Finke,
twenty percent to Nurse Walker, fifteen percent to Nurse Stephens, and five
percent to Nurse Fenton.  The jury awarded
Madeline $1.8 million in damages for future loss of earning capacity; $3.5
million for future medical care and therapy after age eighteen; $60,000 for
past pain and mental anguish; $1 million for future pain and mental anguish;
$250,000 for past physical impairment; $1 million for future physical
impairment; $25,000 for past disfigurement; and $500,000 for future
disfigurement.  The jury awarded the
Morrells $160,000 for past medical, physical, speech, and occupational therapy
expenses; $0 for future care expenses incurred before age eighteen; $2 million
for loss of consortium; and $250,000 each for past mental anguish.  The trial court granted Defendants a JNOV on
the Morrells= claims for
loss of consortium and mental anguish and otherwise rendered judgment on the
verdict for a total of $12,131,153.42 jointly and severally against all
Defendants.

 








                                    III.  Issues Presented

Robert and Donna Morrell
complain in four issues that the trial court erred by granting JNOV on the
damages for loss of consortium and mental anguish.  Dr. Finke and the clinic complain in their
first issue that there is no evidence or factually insufficient evidence that
any negligence of Dr. Finke was a cause-in-fact of Madeline=s injuries.  By their second
issue, they complain that there was no evidence or factually insufficient
evidence of negligence.  By their third
issue, they contend that there is no evidence of the present value of the cost
of Madeline=s future
medical expense, so that the jury=s award of $3.5 million for that element of damages requires reversal
and remand or remittitur.  In their
fourth issue, they complain that the findings of past medical expenses are
excessive. 

The nurses and hospital
complain in four issues that there is legally and factually insufficient
evidence that the nurses= breaches of
the standard of care (which they do not contest) were a cause-in-fact of
Madeline=s injuries, and they join in the complaints of Dr. Finke and the clinic
regarding the past medical expenses and future care findings. The nurse
Defendants further complain that Robert and Donna Morrell=s claim for past medical expenses against them is barred by
limitations. Nurse Fenton also contends that she should only be held severally
liable for the five percent negligence the jury attributed to her.








                                IV.  The Morrells= Appeal

A.  Loss of Consortium 

In their first and second
issues, Robert and Donna Morrell contend that the trial court erred by granting
a JNOV concerning their loss of consortium claim against all Defendants.  After submission, however, the Supreme Court
of Texas decided Roberts v. Williamson, 111 S.W.3d 113 (Tex. 2003),
which the Morrells acknowledge is contrary to their position.  See id. at 119 (holding parents not
entitled to damages for loss of consortium based on serious permanent injuries
to child who has not died).  Accordingly,
we overrule the Morrells= first and
second issues.

B.  Bystander Recovery for Mental Anguish

In their third and fourth
issues, the Morrells contend that the trial court erred by granting a JNOV on
their claim against all Defendants for bystander recovery for past mental
anguish as the result of witnessing their child=s serious permanent injury at birth. 
The Morrells rely on Birchfield v. Texarkana Memorial Hospital,
747 S.W.2d 361, 364-65 (Tex. 1987), arguing that the supreme court in that case
recognized a parent=s entitlement
to mental anguish resulting from serious permanent injury to a child by letting
stand the jury=s award of
that element of damages.








Appellees respond that the
propriety under Texas law of recovering mental anguish damages was not
challenged in Birchfield and that the supreme court did not address such
a right in that case by parents for injury to a child.  Appellees contend that the supreme court
directly addressed and rejected a bystander claim by a husband for mental
anguish damages arising from his wife=s injury in connection with an emergency C-section delivery in Edinburg
Hospital Authority v. Trevino, 941 S.W.2d 76, 81 (Tex. 1997) (holding that ATexas=[s]
bystander cause of action precludes bystander recovery in medical malpractice
cases@).  We agree with Appellees that
the Morrells= claim is
controlled by Edinburg, which precludes recovery of bystander mental
anguish damages in a medical malpractice case as a matter of law.  Accordingly, we overrule the Morrells= third and fourth issues.

We hold that the trial court
correctly granted Defendants= motions for JNOV and correctly declined to include in the judgment
the $2.5 million dollars in damages found by the jury for Robert=s and Donna=s loss of
consortium and mental anguish.








V.  Dr. Finke
and the Clinic=s
Appeal

and the Hospital and Nurses= Appeal

 

A.  Sufficiency of Negligence and Cause-in-Fact
Evidence

Dr. Finke and the clinic
claim in their first issue that the evidence is legally and factually
insufficient to establish that any negligence by Dr. Finke was the
cause-in-fact of any of Madeline=s injuries and in their second issue that no testimony exists as to
the standard of care for Dr. Finke or whether she breached that standard when
she returned to Donna=s delivery
room after delivering another baby.  The
nurses and hospital likewise complain in their first issue that there is
legally and factually insufficient evidence that their negligence was a
cause-in-fact of Madeline=s injuries.

1.  Standards of Review








In determining a Ano evidence@ issue we are to
consider only the evidence and inferences that tend to support the finding of
the disputed factCunless a reasonable juror could not give
credit to such evidence or inferences.  See
City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  We are to disregard all evidence and
inferences to the contrary to the disputed factCunless a
reasonable juror could not disregard such evidence or inferences.  Id. 
But we are not to weigh the evidence or make our own credibility
determinations.  See id.; Bradford
v. Vento, 48 S.W.3d 749, 754 (Tex. 2001); Cont=l Coffee Prods.
Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996); In re King's Estate,
150 Tex. 662, 244 S.W.2d 660, 661 (1951). 
Anything more than a scintilla of evidence is legally sufficient to
support the finding.  Cont=l Coffee, 937 S.W.2d at
450; Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex. 1996).  More than a scintilla of evidence exists if
the evidence furnishes some reasonable basis for differing conclusions by
reasonable minds about the existence of a vital fact.  Rocor Int=l, Inc. v. Nat=l Union Fire Ins.
Co.,
77 S.W.3d 253, 262 (Tex. 2002).

An assertion that the
evidence is Ainsufficient@ to support a fact finding means that the evidence supporting the
finding is so weak or the evidence to the contrary is so overwhelming that the
answer should be set aside and a new trial ordered.  Garza v. Alviar, 395 S.W.2d 821, 823
(Tex. 1965).  We consider all of the
evidence in the case in making this determination.  Mar. Overseas Corp. v. Ellis, 971
S.W.2d 402, 406-07 (Tex.), cert. denied, 525 U.S. 1017 (1998).








In a medical malpractice
case, the plaintiff is required to show evidence of a reasonable medical
probability that the injury was proximately caused by the negligence of the
defendant.  Park Place Hosp. v. Estate
of Milo, 909 S.W.2d 508, 511 (Tex. 1995); Duff v. Yelin, 751 S.W.2d
175, 176 (Tex. 1988).  There are four
elements to be proved:  (1) a duty by the
physician/nurse/hospital to act according to applicable standards of care;  (2) a breach of the applicable standard of
care;  (3) an injury;  and (4) a causal connection between the
breach of care and the injury.  Denton
Reg=l Med. Ctr.
v. LaCroix, 947 S.W.2d 941, 950 (Tex. App.CFort Worth 1997, writ denied). 

To establish proximate cause,
the plaintiff must prove (1) foreseeability and (2) cause-in-fact.  Leitch, 935 S.W.2d at 118-19; Marvelli
v. Alston, 100 S.W.3d 460, 469 (Tex. App.CFort Worth 2003, pet. denied). 
The ultimate standard of proof on cause-in-fact is whether by a
preponderance of the evidence, the negligent act or omission is shown to be a
substantial factor in bringing about an injury, without which the harm would
not have occurred.  Park Place Hosp.,
909 S.W.2d at 511 (quoting Kramer v. Lewisville Mem=l Hosp., 858 S.W.2d 397, 400 (Tex.
1993)); Doe v. Boys Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 477
(Tex. 1995). 








The plaintiff must establish
a causal connection between the defendant=s negligence and the injuries based upon a Areasonable medical probability@ and not upon mere conjecture, speculation, or possibility.  Park Place Hosp., 909 S.W.2d at 511; Lenger
v. Physician=s Gen. Hosp., 455 S.W.2d 703, 706 (Tex. 1970); Marvelli, 100 S.W.3d at
470.  The plaintiff satisfies the
cause-in-fact element of proximate cause by presenting proof establishing a
direct causal connection between the damages awarded, the defendant=s negligence, and the injury suffered. 
Texarkana Mem=l Hosp., Inc. v. Murdock, 946 S.W.2d
836, 838 (Tex. 1997).

The issue of causation is
usually for the trier of fact in medical malpractice cases when (1) general
experience and common sense will enable a layman fairly to determine the causal
relationship between the event and the condition, (2) scientific principles,
usually proved by expert testimony, establish a traceable chain of causation
from the condition back to the event, or (3) a probable causal relationship is
shown by expert testimony.  Lenger,
455 S.W.2d at 706; see Marvelli, 100 S.W.3d at 470.

2.  Expert Testimony

Over the course of the
five-week trial, the jury heard from sixteen expert witnesses.  Plaintiffs relied upon the testimony of
Corrine LaMont, R.N.C, a certified obstetrical nurse, and upon the testimony of
the defendant nurses to establish the standard of care and deviations from the
standard of care for the nurses.  For the
standard of care and deviations alleged against Dr. Finke, they relied upon the
testimony of Dr. James P. Rice, an obstetrician/gynecologist.  Dr. Stewart B. Ater, a pediatric neurologist,
was Plaintiffs= expert
witness on causation as to Madeline=s injuries and on her current condition.  Dr. Kendall Jones, a pediatric
neuroradiologist, interpreted MRI and CT scans on behalf of Plaintiffs.








Dr. Finke and the three
defendant nurses testified in their own behalf and, in addition, relied upon
the testimony of Barbara True-Driver, a high-risk maternal nurse; Dr. Peter
VanDorsten, an obstetrician/gynecologist specializing in maternal-fetal
medicine; and four health professionals who treated Madeline at the
hospital:  Robin White, Director of
Respiratory Care; William Gilmer, respiratory therapist on the NICU team that
assumed care of Madeline at birth; Dr. Scott Tisdell, the neonatologist in the
NICU unit; and Dr. Gilbert Vezina, a pediatric neuroradiologist, who
interpreted the CT and MRI scans for Defendants.








Nurse LaMont testified that
Madeline=s fetal heart monitor strip was Anonreassuring@ from the
start because under the criteria set forth in the hospital=s fetal heart monitoring policy it documented no accelerations and no
beat-to-beat variability.  Nurse LaMont
explained that the nurses failed to assess the fetal heart monitor strip
accurately and failed to evaluate it in accordance with hospital
standards.  Nurse LaMont acknowledged
that even normal labor stresses a fetus, but explained that variable and late
decels indicate decreased oxygenation and have the potential of reducing the
baby=s reserves.  Over time, she
said, a chronic decrease in oxygenation can make it harder for the baby to
tolerate labor.  In her opinion, and
based on the hospital=s fetal
heart monitoring policy, the strip never showed adequate accelerations or good
beat-to-beat variability and reflected numerous and steadily worsening variable
and late decels.  

Nurse LaMont believed
Madeline began developing oxygen deficit beginning at 4:40 p.m.  In her opinion, the nurses deviated from the
standard of care in five different respects: 
by failing to accurately assess the fetal heart monitor strip; by
failing to accurately intervene based on the problems documented on the strip;
by failing to provide timely care to Donna; by failing to access the chain of
command to get timely care for Madeline and Donna; and by failing to properly
resuscitate Madeline after birth.[11]









Dr. Rice, board certified in
obstetrics with a general obstetrical practice, was also a clinical instructor
at the University of Washington Medical Center. Dr. Rice testified for
Plaintiffs as to the standard of care for Dr. Finke.  Based on the fetal heart monitor strip, charts,
and other hospital records, he testified that Dr. Finke deviated from the
standard of care of an obstetrician by failing to perform a timely
C-section.  In Dr. Rice=s opinion, the fetal heart monitor strip was Areassuring@ until about
5:10 p.m.  In his opinion, the strip
became  Anonreassuring@ from 5:20
p.m. until 7:15 p.m.  From 7:15 p.m. on,
Dr. Rice characterized the tracing as Aominous@ and said, Ayou have to really be worried now if the baby is not getting into
severe trouble.@  The 7:15 p.m. decel, he said, was a very Aworrisome@ prolonged
decel that was significant.  After the
prolonged decel at 7:15 p.m., he said that the standard of care at least
required preparation of the room to get ready for a C-section.  Dr. Finke violated the standard of care by
not starting to prepare for a possible C-section at that time.       Dr. Rice further testified that, based on
the entire course of Donna=s labor and Madeline=s condition, the standard of care required Dr. Finke to make the
decision to perform a C-section at 7:27 p.m. 
He testified that Dr. Finke violated the standard of care by not
deciding to perform and not performing a C-section at that point.  Dr. Rice testified that the nurses= notes at 7:25 p.m. indicate that Madeline was still at a zero
station, 

and
that the standard of care would be to perform a cesarean section. . . . You
know, we also have a baby that=s been stressed out already,
is having a very difficult time, and I think that there would be a high risk of
the baby not being able to tolerate anything that would be involved with this
difficult of a forceps delivery.

 

By that time, he testified that the standard of
care was Athat this
baby needs to have a cesarean section to be delivered.  You need to have the baby out as soon as
possible.@








Dr. Rice explained that in a
forceps delivery, pressure is applied to the baby, and if there has been a
problem with the cord, continued interruptions of the blood supply may occur
while the baby is being brought out through the vagina.  Therefore, Dr. Rice said that the standard of
care Aabsolutely@ required a
physician to avoid further stressing this baby through a vaginal delivery.  The failure to perform a cesarean section as
well as the additional mechanical stress of the forceps delivery were,
according to Dr. Ater, proximate causes of the injuries sustained by
Madeline.  

By 7:42 p.m., after the
second prolonged severe decel, the standard of care, in Dr. Rice=s opinion, required that the baby should already have been born, A[b]ut certainly, at this point in time, this baby needs to be born. .
. . Ideally by a very rapid cesarean section [that has] already been set up.@  Dr. Rice said that if the
nurses had prepared for a C-section, it would take about five minutes to wheel
the mother to the operating room, pour on some antiseptic, drape her, and begin
the C-section with a general anesthetic, and in this emergency situation, it
would then take about two minutes to get the baby out. 








Dr. Peter VanDorsten, board
certified in obstetrics and gynecology with a subspecialty in high-risk
maternal-fetal medicine, testified as an expert for Dr. Finke that the
mechanism causing severe variable decels, such as those at 7:15 p.m. and 7:40
p.m. is believed to be Acompression
of the [umbilical] cord@ that causes
the heart to slow down.  Although Dr.
VanDorsten agreed with Dr. Rice that the 7:15 p.m. decel was cause for alert
that the cord was Avulnerable@ with a potential for total compression, he disagreed that a decision
should have been made by 7:27 p.m. to deliver by C-section.  The mother was pushing and, in his opinion,
there was no reason to expect another severe decel.  He interpreted the fetal heart monitor strip
as showing mild decels with contractions superimposed by pushing by the mother.  The question, he said, was whether they were Abothering the fetus.@  In his opinion, the baby was
still Atotally normal at this point.@ 








Dr. VanDorsten agreed that
the second decel at 7:40 p.m. was Asinister@ and that
the baseline of the heart rate was significantly different afterwards. The baby
Acan=t handle@ this one, he said.  That decel
required Dr. Finke=s
assessment, but he still did not believe it required an immediate
C-section.  In his opinion, it was
appropriate for Dr. Finke to ask Donna to push a few more times while she
assessed the situation.  You are Awishing that she=d push the
baby out,@ but OP
labor Atake[s] longer.@  He saw no indications of hypoxia from the
strip and nothing to indicate a progressive loss of reserves of the baby.  In his opinion, Dr. Finke=s decision to effect delivery of the baby after the second decel by
forceps vaginal delivery, rather than by C-section, was within the standard of
care. 

The parties= experts disagreed not only on their interpretations of the fetal
heart monitor strip and the standard of care it necessitated but also
concerning the nature, cause, and origin of Madeline=s neurological injuries.  Dr.
Jones, Plaintiffs=
neuroradiologist, reviewed the CT scan taken two hours after Madeline=s birth, a September 12, 1997 MRI taken when Madeline was two and a
half years old, a November 27, 2000 MRI taken when Madeline was almost seven
years old, and Madeline=s clinical
history.  Dr. Vezina, the Defendants= pediatric neuroradiologist, likewise reviewed these films.  Both Dr. Jones and Dr. Vezina agreed
concerning the objective findings in the films, but they drew different
conclusions from those findings. 

Dr. Jones testified that the
CT scan after Madeline=s birth
revealed a Alittle bit@ of birth trauma with some swelling and some molding of the skull. He
saw no hemorrhage, congenital deformities, or edema.  He would not expect the CT scan done two hours
after birth to document hypoxia. 








Dr. Jones next reviewed the
MRI performed in 1997 and testified that it showed abnormal increased signal
around the ventricles, raising a concern about periventricular leukomalacia
(PVL), most commonly caused in term babies by hypoxic ischemic encephalopathy.[12]  PVL is an abnormal development of the white
matter next to the ventricle.  Dr. Jones explained that since Madeline was only about two years old
at the time of the 1997 MRI, the finding could be simply an instance of
immature myelination that would resolve itself. 
He explained, however, that when immature myelination occurs it usually
is visible equally on both the left and right sides of the brain, not as in
Madeline=s MRI, only on the left side. 
Consequently, in his opinion, because the finding was not symmetrical,
it was more likely a finding of some type of PVL.  The most common cause of PVL in a term infant
is a hypoxic or lack-of-oxygen injury at the time of birth. 








Madeline=s November 27, 2000 MRI confirmed an asymmetric finding that Dr. Jones
considered Avery
characteristic, even more characteristic than the earlier MRI, of what one
would see with periventricular leukomalacia,@ Athis pattern
is quite typical and characteristic of what you see in hypoxic ischemic
disease.@  Additionally, he said that
Madeline=s clinical history presented a picture consistent with hypoxic
ischemic induced PVL:  Madeline was born
acidotic and had hypotonia, seizures, apnea, and had low Apgar scoresCall findings Dr. Jones commonly sees with babies who have suffered a
hypoxic injury.  Dr. Jones testified that
all of Madeline=s symptoms
and the results of the tests performed upon her are consistent with a hypoxic
brain injury. 

By contrast, Dr. Vezina
testified that the films showed no evidence of any hypoxic ischemic event when
Madeline was born.  He agreed that the
two-hours-after-birth CT scan would not show any hypoxia; it was too soon.  But he testified that a January 5, 1995
ultrasound and an April 5, 1995 CT scan likewise show no evidence of a hypoxic
birth injury.  According to Dr. Vezina,
the September 1997 MRI did not show any atrophy or scarring of the brain, two
features one would expect to see following a hypoxic event.  He said that the white spot noted as PVL by
Dr. Jones was simply immature myelination. 
He testified that, in the term infant, PVL is usually not caused by a
hypoxic ischemic event at birth;

most
of the time what you find is that there was no hypoxic ischemic event at the
time of delivery, at the time of term. 
And oftentimes what we try to find with varied success are insults or
things that happened during pregnancy when the fetus is much younger before 34,
35 weeks gestation. 

 

Finally, concerning the November 2000 MRI, Dr.
Vezina testified that the remaining white spot is a Asmall@ Anon-specific@ area, but
not PVL.  He said he Adoubt[s]@ this small
spot of brain injury has caused or contributed to Madeline=s developmental delays.  








Dr. Ater, Plaintiffs= causation expert, testified that in reasonable medical probability
Madeline=s brain injury occurred during the forceps delivery.  In his opinion, the proximate cause of
Madeline=s brain injury was forceps birth trauma in conjunction with hypoxic
ischemic insults she suffered during both labor and delivery, compounded by her
significant loss of blood volume due to the bruising and hematomas she
experienced.[13]









Dr. Ater testified and
demonstrated that when a person pushes on his 
hand or his fingernail bed, it gets white because the pressure
temporarily decreases the blood flow to the area; when the pressure is released,
the area becomes red again as blood flows back into it.  He explained that this is what happened to
Madeline=s brain when Dr. Finke applied the forceps; Madeline=s head is still, over six years later, indented on the left side where
the forceps prong was placed.  This
severe pressure on the left side of Madeline=s skull pushed in on the left side of her brain and exerted
pressure.  Dr. Ater testified that
because, prior to the forceps delivery beginning at about 4:40 p.m. and
continuing through delivery, Madeline suffered repeated hypoxic insults and was
losing blood volume from internal bleeding, the mechanical traumatic insult of
the ten to fifteen minutes of forceps pressure decreased the blood supply to
that part of her brain and Awas the straw that broke the camel=s back.@  He testified that Madeline suffered hypoxia
induced PVL on the left side of her brain corresponding to the location on her
left temple where pressure was applied and the forceps indentation
remains.  Dr. Ater explained that
Madeline=s second, 2000 MRI Aruled out@ other
possible causes of Madeline=s brain injury. Madeline=s PVL is located in an area of the brain responsible for leg control
and, because the left side of the brain controls the right side of the body,
Dr. Ater said that the PVL explains Madeline=s gaitCshe drags
her right leg when she walks.  Dr. Ater
testified that Madeline will continue to suffer substantial permanent
neurological injuries.








Dr. Tisdell, the treating
neonatologist in the NICU, was of the opinion that in reasonable medical
probability the cause of Madeline=s symptoms was an infection, not hypoxia or asphyxia.  Dr. Tisdell testified that all of the
negative cultures did not rule out some subclinical infection. The bad outcome,
he said, was more likely caused by a subclinical infection.[14]  He testified that babies can have serious
morbidity, even death from infection, even though cultures are negative.








Dr. Tisdell further testified
that the pH value of 7.32 for the blood Dr. Finke drew immediately after birth
was Aperfect@ for
oxygenation at the time of birth and precluded perinatal asphyxia.[15]  He testified that the indented bruise near
Madeline=s left temple would not be unusual for a forceps delivery and, in his
opinion, it did not equate to brain damage. 
Madeline=s acid
build-up, in his opinion, was metabolic and not indicative of acidosis or
asphyxia at birth.  It could mean a
metabolic defect, congenital or chromosomal problems, or infection.  Additionally, he said, he would have expected
seizures from any brain damage at birth within the first twenty-four hours,
which he claimed Madeline did not manifest. 
He also consulted with Dr. Laney, a pediatric neurologist, who did not
assess Madeline as having asphyxia at birth.[16]      Dr. VanDorsten also disagreed with Dr.
Ater=s opinion that cumulative, increasingly severe hypoxic ischemic
insults combined with trauma from the vaginal forceps delivery were the cause
of Madeline=s
neurological deficits.  In reasonable
medical probability, in his opinion, Madeline=s current condition is not related to Dr. Finke=s care.  Likewise, Dr. Finke and
the defense experts in obstetrics, pediatric neurology, and pediatric
neuroradiology all testified that Madeline=s neurological condition did not result from perinatal hypoxic
ischemic injury or from any other aspect of labor or delivery. 

All experts agreed that the
cause of cerebral palsy remains unknown in a large percentage of cases.  Numerous causes for cerebral palsy exist,
including infections such as rubella, herpes, and other bacterial and viral
infections during pregnancy, and many types of genetic causes, metabolic
causes, chromosome changes, exposure to chemical toxins, insults at earlier
times in pregnancy, and prematurity.  Dr.
Ater acknowledged that despite the research and efforts over the past decade or
more, the percentage of cerebral palsy is not getting better, as more sick and
premature babies are surviving. 








The American College of
Obstetricians and Gynecologists (AACOG@) has issued
ABulletin 163@ setting
forth criteria to assist in determining whether labor-and-delivery hypoxia has
caused cerebral palsy.  Those criteria
are (1) a low Apgar score of zero to three for more than five minutes, (2)
seizures and or hypotonia within the first twelve to twenty-four hours, (3)
multi-level system failures, and (4) an umbilical cord arterial blood sample
with a pH less than 7.0.[17]  Defendants and their experts claim that none
of these criteria were met in the present case; Madeline=s five-minute Apgar score was 6, she had no seizures or hypotonia
within the first twelve to twenty-four hours, she had no multi-level system
failures, and she had a pH of more than 7.0. 








Plaintiffs= experts asserted that Madeline did meet the ACOG criteria. Nurse
Walker gave Madeline a five-minute Apgar score of 6.[18]  But Nurse LaMont testified that Apgar scores
are Asubjective@ and that Athere are times when people will be a little generous on these scores,
for whatever reason, and that can indeed increase the Apgar score, and it might
B in my hands or your hands, it might be two different scores.@  Dr. Ater testified that
Madeline=s five-minute Apgar score was Agenerous@; Athis baby needed resuscitation including ventilation [by the NICU
team].  One of the scores was for
breathing.  It doesn=t make sense.  I mean, I=m not sure how they scored that baby was breathing when they were
giving bag and mask artificial ventilation.@  He said that A[a] baby who is so depressed that it can=t even breath [sic] is not going to have all these reactions and motor
movements@ required to
obtain Apgar points for muscle tone, reflex, and skin color.

Dr. Ater and Nurse LaMont
both testified that Madeline did have hypotonia when she was born.  And after she was born, for the first three
days of her life, Madeline was intubated, on a respirator, and either paralyzed
with a drug called Pavulon, so that she could not fight against the respirator
breathing for her, or heavily sedated. 
Therefore, Dr. Ater said there is no way to know whether, if unparalyzed
and unsedated, Madeline would have experienced seizures; the drug-induced
paralysis and heavy sedation prevented any seizures.  Madeline did suffer multi-level system
failures from her delivery; she suffered internal bleeding, creating hematomas
on her adrenal gland and liver.  And
finally, Plaintiffs contended that, in fact, Madeline=s pH level at
birth was much lower than 7.32, around 6.9 to 7.1. 








Plaintiffs contend that the blood obtained by Dr. Finke
showing a 7.32 pH was not properly drawn for pH testing.  Plaintiffs= experts testified
that obtaining an accurate pH reading from cord blood requires the use of a
hepranized syringe inserted into the umbilical cord=s artery and
requires that the drawn blood sample be placed on ice during transport for
testing.  The labor and delivery summary
signed by Dr. Finke indicates that she took cord blood from Madeline to test it
for blood type and compatibility with Donna=s blood, not to
test it for pH.  Drawing umbilical cord
arterial blood takes more than one minute, yet Dr. Finke wrote in her labor and
delivery summary that she took this blood during the same minute that Madeline
was born, 8:06 p.m.  Type and
compatibility testing, however, may be accomplished with a blood sample drained
from the cut and clamped cord; a procedure that may be performed easily in less
than a minute. Consequently, Plaintiffs asserted at trial that the 7.32 pH
result was inaccurate because it was performed on mixed arterial and venus cord
blood intended to be used for type and compatibility testing, not pH
testing.  Dr. Finke=s expert, Dr.
VanDorsten, agreed that venus blood is Ameaningless@ in determining pH;
pH must be determined from arterial blood. 
If the cord gas sample had been properly drawn from the cord=s artery, Nurse
LaMont Awould expect it to
be a lot lower than 7.2.@ 








According to Dr. Ater, Dr. Tisdell=s pH reading of
7.219 is inconsistent with Madeline having a 7.32 pH at birth; after Madeline
had been bagged and given one hundred percent blowby oxygen for twenty-four
minutes, her pH level should have risen, not gone down.[19]  Dr. Ater opined that, considering the
extensive resuscitation efforts performed on Madeline during the first twenty-four
minutes of her life and Areasoning backwards,@ or Aextrapolat[ing]
back to birth,@ Madeline=s pH at birth was
between 6.9 and 7.1, Ain the range where so many of these
studies show that asphyxia occurs.@  Finally, Dr. Ater
believed that although the ACOG bulletin criteria were useful, they were not
exclusive and should not be used to rule out hypoxia because A[u]nder these criteria all you have to fudge or torque, the only
things that have to be altered would be missing blood gas or an erroneous blood
gas and generous Apgar score.@  Dr. Ater pointed out that the
author of an authoritative textbook agreed with his position that the ACOG=s bulletin criteria are advisory only, not exclusive. 

3.  Dr. FinkeCEvidence of Negligence and Cause-in-Fact[20]

Dr. Finke argues that there
is a Afatal gap@ in the
chain of causation because Dr. Ater=s opinions on causation were never linked to any breach of the
standard of care constituting negligence by Dr. Finke as testified to by Dr.
Rice. As discussed below, the record before us contains evidence that Dr. Finke=s negligence in failing to perform a C-section proximately caused
Madeline=s injuries.[21]  








Dr. Rice testified, as
outlined previously, that based on the fetal heart monitor strip, charts, and
other hospital records, Dr. Finke deviated from the standard of care of an
obstetrician by failing to perform a timely C-section and by proceeding with a
vaginal delivery.  Dr. Rice explained
that the standard of care required Dr. Finke to prepare for a possible
C-section after the prolonged decel at 7:15 p.m., and that Dr. Finke violated the
standard of care by not preparing at that time for a possible C-section.  Dr. Rice testified that by 7:27 p.m. the
standard of care required a decision to perform a C-section and that Dr. Finke
violated the standard of care by not deciding to perform and by not performing
a C-section at that point and by then proceeding with a vaginal delivery. 








According to Dr. Ater, the
failure to perform a C-section resulted in a vaginal forceps delivery, which
proximately caused the injuries sustained by Madeline. Dr. Ater testified that
Madeline lost her reserves based on the cumulative hypoxic ischemic insults
occurring from about 5:10 p.m. onward so that she had inadequate reserves and
oxygenation to sustain her through the vaginal forceps delivery; Madeline=s brain damage occurred Aduring the relatively prolonged forceps delivery . . . [a]nd it wasn=t just a very short one minute of time the way you deliver a regular
baby.  That was about 10 or 15 minutes
worth.@  Dr. Ater repeatedly explained
that the vaginal forceps delivery Awas the straw that broke the camel=s back.@  He testified,[22]

We know that she [Madeline] had significant
mechanical injury [from the forceps]. 
The chart is full of documentation that people think that the forceps
delivery caused the edema of the skull, the bleeding, the laceration of the
ear.

 

They were even so concerned about the changes in
the shape of the skull that they were concerned about a possible skull fracture
and they had consultants consulting about a possible skull fracture.

 

It didn=t turn out, but the point is,
there was substantial amount of molding and I think that the molding may have
caused some localized changes.  Again, I
think that in a normal patient who has forceps, you don=t
have this serious problem when forceps are appropriately applied.

 








However, in this patient where there was already
a hypoxic-ischemic pre-existing insult, by adding this additional mechanical
traumatic insult, I think that the consequence to the brain was that the blood
supply in that area that was getting pushed on decreased and it set the brain
up for this PVL.  And it all fits with
what we see.  It fits with the MRI scan.  It fits with her clinical status.[23]


 

. . . .

 

I believe this occurred during the latter ten
minutes of birth.  I believe that at that
point the child lost her reserves and in addition to the cumulative damage of
all the hypoxia and ischemia she had, then she lost blood volume due to bleeds,
and I believe it was a process that didn=t occur exactly at one
specific minute, but it was getting worse and worse and worse, and I believe
the injury occurred during the process of delivery, the instrumented forceps
delivery when the trauma occurred.[24]


 

There is nothing else that fits this.  This just fits hypoxic ischemic
encephalopathy so perfectly that it=sCI
cannot think of anything that comes even close to explaining her problem given
all of . . . the clinical symptoms, the laboratory symptoms.  We know the cause.  We know documented evidence of hypoxic
ischemia.  This whole thing fits so well
with hypoxic ischemic encephalopathy that I can=t
think of any other diagnosis that really makes sense.  

 

It is undisputed that if Dr. Finke had decided to
perform a C-section at 7:27 p.m. in compliance with the standard of care, as
testified to by Dr. Rice, Madeline would not have experienced the prolonged
vaginal forceps delivery that Dr. Ater concluded proximately caused her brain
damage.[25]













Dr. Finke points out that at
7:27 p.m. she was not in Donna=s room; she was across the hall delivering another baby.  She claims that no expert testimony exists as
to the standard of care when she returned to Donna=s room at 7:35 p.m.  But Dr.
Rice testified that from 7:27 p.m. onward, Madeline was so Astressed@ that the
standard of care from that point forward Aabsolutely@ required a
C-section to avoid further stressing her through a vaginal delivery. Dr. Rice
testified that at 7:42 p.m. the standard of care dictated that a C-section,
which already should have occurred, be performed immediately.[26]  Therefore, the record does contain expert
testimony concerning the standard of care for Dr. Finke from 7:27 p.m. onward,
including 7:35 p.m.








Thus, considering the
evidence and inferences favorable to the jury=s negligence and proximate cause findings concerning Dr. Finke that a
reasonable juror could credit and disregarding all evidence and inferences to
the contrary because a reasonable juror could, the evidence is legally
sufficient to support these findings. 
Dr. Rice=s testimony
that Dr. Finke was negligent in failing to decide at 7:27 p.m. to perform a
C-section and Dr. Ater=s testimony
that by 7:27 p.m.Cbecause
Madeline had suffered cumulative, increasingly severe, hypoxic ischemic insults
for hours; she had lost her fetal reserves to the extent that she could not
withstand a vaginal forceps delivery; and the prong of the forceps clamping
down on her left temple prevented adequate oxygenation and caused her PVLCconstitutes more than a scintilla of evidence supporting the jury=s findings.  See Lenger,
455 S.W.2d at 706; see also Marvelli, 100 S.W.3d at 470.  This evidence establishes by expert testimony
that, but for Dr. Finke=s negligent
failure to perform a C-section, the vaginal forceps delivery and consequently
Madeline=s brain damage would not have occurred; it establishes by expert
testimony a probable causal relationship between Dr. Finke=s negligence and the injury Madeline suffered.  See Park Place Hosp., 909
S.W.2d at 511; Lenger, 455 S.W.2d at 706; Marvelli, 100 S.W.3d at
469; see also Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex.
1995) (recognizing that causation is established by proving defendant's conduct
caused event that caused the plaintiff to suffer compensable injuries). 








Applying the factual
sufficiency standard of review to the evidence, we consider all of the evidence
to determine whether the evidence supporting the jury=s negligence and proximate cause findings concerning Dr. Finke is so
weak or the evidence to the contrary so overwhelming that the answers should be
set aside and a new trial ordered.  Mar.
Overseas Corp., 971 S.W.2d at 406-07; Garza, 395 S.W.2d at 823.  During the Plaintiffs= case, an obstetrician/gynecologist, Dr. Rice, testified that Dr.
Finke was negligent in failing to timely decide to perform a C-section, in
failing to perform a C-section at all, and in proceeding with a vaginal, forceps
delivery.  A pediatric neuroradiologist,
Dr. Jones, reviewed Madeline=s MRI and CT scans and testified that Madeline had PVL.  And, a pediatric neurologist, Dr. Ater,
testified that Madeline=s PVL was
caused by the traumatic forceps delivery of a baby whose fetal reserves had
been depleted and who had suffered repeated hypoxic events, documented by the
fetal heart monitor strip.  Conversely,
during Defendants= case, an
obstetrician/gynecologist, Dr. VanDorsten, testified that Dr. Finke was not
negligent in failing to perform a C-section. 
Dr. Finke likewise offered her own testimony that she was not negligent.  A pediatric neuroradioligist, Dr. Vezina,
reviewed Madeline=s MRI and CT
scans and testified that Madeline did not have PVL, just immature myleniation,
which subsequently resolved to a remaining, small, Anon-specific@ white
spot.  He also testified that this white
spot would cause no neurological problems for Madeline.  And, finally, all experts agreed that tests
ruled out genetic metabolic abnormality, meningitis, and encephalitis as
potential causes of Madeline=s symptoms and that all cultures performed at the hospital for all
infections were negative.  Thus, here,
the jury was presented with strong expert testimony on both sides of the negligence
and cause-in-fact issues.








Medical malpractice cases
often present "a battle of the experts."  Cruz, 44 S.W.3d at 646 (citing
Magee v. Ulery, 993 S.W.2d 332, 336 (Tex. App.CHouston [14th Dist.] 1999, no pet.)). 
In a battle of competing experts, it is the sole obligation of the jury
to determine the credibility of the witnesses and to weigh their testimony.  See Welch v. McLean, No.
2-02-00237-CV, 2005 WL 1293068, at *7 (Tex. App.CFort Worth June 2, 2005, no pet. h.) (not yet reported); Warner v.
Hurt, 834 S.W.2d 404, 408-09 (Tex. App.CHouston [14th Dist.] 1992, no writ). 
It is particularly within the jury's province to weigh opinion evidence
and the judgment of experts.  Cruz,
44 S.W.3d at 647 (citing Pilkington v. Kornell, 822 S.W.2d 223, 230
(Tex. App.CDallas 1991,
writ denied)).  The jury decides which
expert witness to credit.  Id.

When we review evidence, we
are not free to reweigh the evidence and set aside a jury verdict merely
because we feel a different result is more reasonable.  Pool v. Ford Motor Co., 715 S.W.2d
629, 634 (Tex. 1986) (op. on reh=g).  We may not merely
substitute our opinion for that of the trier of fact and determine that we
would reach a different conclusion.  Cruz,
44 S.W.3d at 647; Merckling v. Curtis, 911 S.W.2d 759, 763 (Tex. App.CHouston [1st Dist.] 1995, writ denied).  We cannot sit as a thirteenth juror, and we
cannot under any circumstances retry the case. 
See Warner, 834 S.W.2d at 408-09.








Here, the jury was free to
believe Plaintiffs= experts,
Drs. Ater, Rice, and Jones, instead of the defense experts.  The jury was free to believe Plaintiffs= theory of the case instead of the defensive theory of the case.  See, e.g., id. Plaintiffs= negligence and cause-in-fact evidence concerning Dr. Finke is not so
weak, nor Defendants=
controverting evidence so overwhelming that the jury=s findings should be set aside and a new trial ordered.  See Mar. Overseas Corp., 971 S.W.2d at
406-07; Garza, 395 S.W.2d at 823. 


We overrule the first and
second issues of Dr. Finke and the clinic.

4.  The NursesCCause-in-Fact[27]

The nurses contend that
legally insufficient evidence exists, under Lenger, of the cause-in-fact
element of proximate cause to support the jury=s negligence finding against them. 
Again,
we do not detail all of the evidence of the nurses= alleged breaches
of the standard of care because the nurses do not challenge this aspect of the
jury=s negligence
findings against them.  We do briefly summarize
some of this evidence, however, because it forms the basis for the jury=s cause-in-fact
finding.













Nurse Walker testified that when Dr. Finke was out of the
room, AI am responsible
for that strip.  I=m responsible to
know how that baby is responding to labor.@  Rose Fenton, the charge nurse during Madeline=s delivery,
testified that hospital policies required Nurse Walker to classify Madeline=s strip as
reassuring or nonreassuring, to assess fetal distress, and to assess the need
for a C-section.  Nurse Walker testified that she is to comply with the hospital=s policies and with the standard of care in discharging her nursing
duties.  Nurse Walker testified that if
circumstances dictated, she could set things in motion for a delivery by
C-section.  Nurse LaMont testified, frame
by frame, about Madeline=s fetal
heart monitor strip. She testified that it was nonreassuring from 5:10 p.m. on
and documented fetal distress requiring immediate action by 7:00 p.m.  Nurse LaMont explained that the patterns
documented on Madeline=s strip
indicate a lack of oxygenation and said that it was the nurses responsibility
to monitor and ensure adequate fetal oxygenation.  Finally, Nurse LaMont testified that the
nurses breached the nursing standard of care in numerous respects, by failing
to accurately assess the fetal heart monitor strip; failing to accurately
intervene based on the problems documented on the strip, including failing to
notify Dr. Finke of the significant decel at 7:15 p.m.; failing to provide
timely care to Donna, including failing to prepare Donna for a C-section;
failing to access the chain of command to get timely care for Madeline and Donna,
specifically failing to page or call for another physician when Dr. Finke was
not available; and failing to properly resuscitate Madeline after birth.[28]


During his three days of trial testimony, Dr. Ater used
slides to explain to the jury the physical impact of the continuing, worsening,
hypoxic ischemic insults documented on Madeline=s fetal heart
monitor strip.  Dr. Ater explained that although Madeline=s permanent brain injuries actually occurred during the forceps
delivery, she had been Aset up@ for the injuries by her course of care throughout the day,
specifically her continued lack of adequate oxygenation from about 5:10 p.m.
through her birth. 








The nurses argue that their
negligence could not be a cause-in-fact of any injury to Madeline because all
of Madeline=s injuries
occurred during the vaginal forceps delivery and the decision to perform a
vaginal forceps delivery instead of a C-section was a medical decision that
only Dr. Finke could make.  Thus, the
nurses essentially argue that Dr. Finke=s conduct and medical decisions were a new and independent cause of
Madeline=s injury.  See, e.g.,
Dillard, 157 S.W.3d at 432 & n.3 (recognizing Anew and independent cause means the act or omission of a separate and
independent agency, not reasonably foreseeable, that destroys the causal
connection, if any, between the act or omission inquired about and the
occurrence in question and thereby becomes the immediate cause of the
occurrence@).  But a new and independent cause instruction
was submitted to the jury; the jury rejected it and nonetheless found that the
nurses= negligence was a proximate cause of Madeline=s injuries.  








More than one proximate
cause, including more than one cause-in-fact, may exist.  Lee Lewis Constr., Inc. v. Harrison,
70 S.W.3d 778, 784 (Tex. 2001) (AMore than one act may be the proximate cause of the same injury.@); see also Hall v. Huff, 957 S.W.2d 90, 96-98 (Tex. App.CTexarkana 1997, pet. denied) (reversing causation summary judgment for
first doctor where second doctor perforated patient=s heart); Harvey v. Stanley, 803 S.W.2d 721, 725-26 (Tex. App.CFort Worth 1990, writ denied) (holding first doctor liable for failure
to diagnose heart condition where patient died during subsequent stress test
conducted under supervision of second doctor). 
There can be concurrent proximate causes; all persons whose negligent
conduct contributes to the injury, proximately causing it are liable.  Travis v. City of Mesquite, 830 S.W.2d
94, 98 (Tex. 1992) (op. on reh=g).  The ultimate standard of
proof on cause-in-fact is whether by a preponderance of the evidence, the
negligent act or omission is shown to be a substantial factor in
bringing about an injury, without which the harm would not have occurred.  Park Place Hosp., 909 S.W.2d at 511; Doe,
907 S.W.2d at 477.


















Considering the evidence and
inferences that a reasonable juror could credit and that tend to support the
jury=s cause-in-fact findings concerning the nurses breaches of the standard
of careCfailure to accurately assess the fetal heart monitor strip to
recognize Madeline=s increasing
stress and inadequate oxygenation, failure to accurately intervene based on the
problems documented on the strip to ensure Madeline=s adequate oxygenation, and the failure to provide timely care to
Donna to ensure Madeline=s
oxygenation, including the failure to prepare Donna for a C-sectionCand disregarding all evidence and inferences to the contrary because a
reasonable juror could, the evidence is legally sufficient to permit the jury
to conclude that the nurses= breaches of the standard of care were a substantial factor in
bringing about Madeline=s brain injury
and without which Madeline=s brain injury would not have occurred.  Dr. Ater explained that Madeline had been Aset up@ for the
injuries she suffered during the forceps delivery by her lack of adequate
oxygenation from about 5:10 p.m. through her birth.  Dr. Ater testified that Ain a normal patient who has forceps, you don=t have this serious problem[,]@ but Ain this
patient where there was already a hypoxic-ischemic pre-existing insult, by
adding this additional mechanical traumatic insult, I think that the
consequence to the brain was . . . PVL.@  Dr. Ater explained, AI don=t think one
- - the forceps alone would have done it [caused
Madeline=s PVL].  I think that the
forceps was a straw that broke the camel=s back.@  In other words, the evidence shows that if
Madeline had been adequately oxygenated throughout the day prior to the vaginal
forceps delivery, that delivery alone would not have caused her brain injury;
she would have had sufficient fetal reserves to sustain her through it.  Thus, evidence exists that the nurses= unchallenged standard of care breachesCfailure to accurately assess the fetal heart monitor strip to
recognize Madeline=s increasing
stress and inadequate oxygenation, failure to accurately intervene based on the
problems documented on the strip to ensure Madeline=s adequate oxygenation, and the failure to provide timely care to
Donna to ensure Madeline=s
oxygenation, including the failure to prepare Donna for a C-sectionCconstituted a substantial factor in bringing about Madeline=s brain injury and without which Madeline=s brain injury would not have occurred; Dr. Ater specifically
testified that the forceps delivery alone would not have caused Madeline=s injury if she had been adequately oxygenated.  Thus, more than a scintilla of evidence
exists under the third Lenger prongCa probable causal relationship shown by expert testimonyCthat the nurses=
unchallenged standard of care breaches as testified to by Nurse LaMont were a
cause-in-fact of Madeline=s injury.[29]  Lenger, 455 S.W.2d at 706; accord
Lee Lewis, 70 S.W.3d at 784 (holding more than a scintilla of evidence
existed that defendant=s failure to
require workers to use independent lifelines was substantial factor in causing
plaintiff=s death); see
also Long v. Mo. Delta Med. Ctr., 33 S.W.3d 629, 637-38 (Mo. Ct. App. 2000)
(holding evidence similar to present evidence was sufficient to support jury=s Abut/for@ causation finding against labor and delivery nurse despite contention
that her Aliability .
. . ends when the physician assumes control of his patient@).








Additionally, the evidence
establishes that the nurses negligence was a cause-in-fact of Madeline=s injuries under the second Lenger prongCexpert testimony providing scientific principles allowing the fact
finder to establish a traceable chain of causation from the condition back to
the event.  See Lenger, 455 S.W.2d
at 706; Marvelli, 100 S.W.3d at 470. 
Madeline=s current
condition is caused by her PVL, according to pediatric neuroradiologist Dr.
Jones.  Madeline=s PVL was caused by lack of adequate oxygenation during the forceps
delivery, according to pediatric neurologist Dr. Ater.  Madeline=s lack of adequate oxygenation during the forceps delivery occurred,
according to Dr. Ater, because she had been experiencing repeated, increasingly
severe, hypoxic ischemic insults for hours, throughout Donna=s labor.  According to Nurse
LaMont, the standard of care required the nurses to accurately assess the fetal
heart monitor strip and to ensure that Madeline was adequately oxygenated; they
were negligent by failing to intervene based on the oxygenation problems
documented on the strip.  Thus, a
traceable chain of causation, provided by expert testimony, exists connecting
the nurses=
unchallenged standard of care breaches to Madeline=s brain injury.[30]









In support of their
contention that no cause-in-fact evidence exists in this case, the nurses cite Roark
v. Allen, 633 S.W.2d 804 (Tex. 1982), Duff v. Yelin, 751 S.W.2d 175
(Tex. 1988), and Arlington Memorial Hospital Foundation, Inc. v. Baird,
991 S.W.2d 918 (Tex. App.CFort Worth
1999, pet. denied).  In Roark, an
expert testified that the child=s skull was fractured as a result of the forceps slipping, but no
expert testified that the Aalleged improper application of the forceps caused them to slip.@  633 S.W.2d at 811.  In Duff, the plaintiff did not have an
expert, but relied instead upon the defendant doctors= testimony.  751 S.W.2d at
176.  The defendant doctors would not and
did not testify that either of the two possible causes propounded by the
plaintiff for his ulnar nerve injury caused the injury within a reasonable
medical probability.  Id.  In Baird, no expert testified that a
reused phaco tip caused Baird=s eye burn.  991 S.W.2d at
923.  In the present case, unlike in Roark,
Duff, and Baird, independent, direct expert testimony based on
reasonable medical probability exists concerning causation. Dr. Ater testified
that in reasonable medical probability Madeline=s continued, worsening hypoxic ischemic insultsCwhich Nurse LaMont testified were documented on the fetal heart
monitor strip and negligently misread and not acted upon by the nursesCAset up@ Madeline
for PVL.  According to expert testimony
by Dr. Ater, if Madeline had not been Aset up,@ the forceps
delivery alone would not have caused her PVL. 
Thus, the expert testimony present in the record before us distinguishes
this case from Roark, Duff, and Baird.








Applying the factual
sufficiency standard of review to the evidence, the evidence supporting the
jury=s finding that the nurses= negligence was a proximate cause, including a cause-in-fact, of
Madeline=s injuries is not so weak nor is the evidence to the contrary so
overwhelming that the answer should be set aside and a new trial ordered.  See Mar. Overseas Corp., 971 S.W.2d at
406-07; Garza, 395 S.W.2d at 823. 
We overrule the nurses= and hospital=s first
issue.[31]

B.  Past and Future Medical Expenses








Dr. Finke and the clinic, in
their third and fourth issues, and the hospital and the nurses in their second
issue, complain that the jury=s award of $160,000 for Madeline=s past medical expenses and of $3,500,000 for Madeline=s future medical expenses is supported by factually insufficient
evidence.  They also argue that the jury=s award of $160,000 for past medical expenses is excessive because
they contend that Madeline sustained some degree of injury not caused by Dr.
Finke=s or the nurses= negligence
and that the Morrells failed to segregate damages caused by Dr. Finke or the
nurses from damages that they did not cause. 
And, they claim that the jury=s award of future medical expenses is excessive because Plaintiffs= expert on future-medical-expenses damages failed to reduce her
damages testimony to present value.  Alternatively,
they ask this court to order a remittitur concerning both of these elements of
damages. 

1.  Segregation

Defendants contend that
Plaintiffs were required to segregate past and future medical expenses damages
that the nurses allegedly caused from the damages Dr. Finke allegedly
caused.  Defendants argue that Plaintiffs
were required to segregate damage Madeline suffered from hypoxic ischemic
insults prior to 7:27 p.m. from the damage she suffered based on Dr. Finke=s alleged breaches of the standard of care from 7:27 p.m. onward.[32]  In support of this contention, they cite Texarkana
Memorial Hospital v. Murdock.  946
S.W.2d at 838.













The Murdock case,
however, involved a baby born with congenital defects; the supreme court held
that the defendants could not be held responsible for past medical expenses
associated with the baby=s congenital
defects.  Id. at 840.  The supreme court explained that a plaintiff
may recover only for medical expenses specifically shown to result from
treatment made necessary by the negligent acts or omissions of the defendant,
where such a differentiation is possible. 
Id.; see also Hilland v. Arnold, 856 S.W.2d 240, 242 (Tex.
App.CTexarkana 1993, no writ) (recognizing plaintiff should not recover for
medical expenses for treatment of preexisting condition); Kulms v. Jenkins,
557 S.W.2d 149, 154 (Tex. Civ. App.CAmarillo 1977, writ ref=d n.r.e.) (same).        Here,
Defendants do not contend that Madeline=s medical expenses were incurred for treatment of a congenital
defect.  Likewise, Defendants do not
contend that Madeline incurred medical expenses for treatment of some condition
existing prior to Defendants= alleged negligence during Donna=s labor and the delivery of Madeline. 
Instead, here, the jury was free to believe the expert testimony that
the nurses= negligence
in misreading the strip and failing to take action based on the strip permitted
Madeline to suffer increasingly severe inadequate oxygenation so that she was Aset up@ for PVL and
that Dr. Finke=s negligence
in performing a vaginal forceps delivery instead of a C-section caused the
already-oxygen-deprived Madeline irreparable brain damage.  Thus, we hold that the Murdock
segregation ruleCrequiring segregation
of medical expenses incurred for treatment made necessary by the negligence of
the defendant from medical expenses incurred for treatment of other conditions
that were not made necessary by the negligence of the defendantCis inapplicable here; evidence existed that all of Madeline=s past medical expenses were incurred for treatment made necessary by
her hypoxic ischemic encephalopathy that experts testified, and the jury found,
resulted from  Defendants= negligence.

2.  Past Medical Expenses

Defendants claim that the
jury=s award of $160,000 in past medical expenses is excessive.[33]  The jury was asked in special question number
4, A[w]hat sum of money, if any, if paid now in cash, would fairly and
reasonably compensate ROBERT MORRELL and DONNA MORRELL for their loss resulting
from the injuries of MADELINE MORRELL.@  Item A under this question
instructed the jury to consider, 

The
reasonable and necessary expenses for hospital care, rehabilitative care,
medical care, physical therapy, occupational therapy, speech therapy,
attendant/custodial care, medicine, and durable goods in the past.

 








The jury wrote $160,000 in the blank following
this element of damages.      Plaintiffs= exhibit 18 documented $69,577.98 in medical expenses for Madeline;
medical records affidavits support this amount. 
See Tex. Civ. Prac. &
Rem. Code Ann. '18.001
(Vernon 1997).  Additionally, Madeline
received physical therapy, speech therapy, and occupational therapy each once a
week for years, through the summer of 2000. 
Donna testified that therapies cost Aover $250" per week.  Dr.
Ater testified that these therapies were necessitated by Madeline=s hypoxic ischemic encephalopathy. 
Six years of weekly physical therapy, speech therapy, and occupational
therapy at Aover
$250" per week would cost over $78,000. 

Dr. Cheryl Silver, a
neuropsychologist, testified that she has examined Madeline twice.  She specializes in treatment planning and
teaches graduate students Ahow to do appropriate and accurate testing for the purpose of
diagnosis and for the purpose of treatment planning@ for mentally retarded children.[34]  Dr. Silver performed diagnostic testing on
Madeline and testified that Madeline

needs
occupational therapy because of her motor problems, because of her motor, fine
motor and visual motor problems, that she needs physical therapy because of her
gross motor problems and balance problems, that she needs language therapy or
its sometimes called speech therapy for her language problems, that it seems that
she requires therapy or consultation from a person who specializes in parenting
skills or behavior management.

 

Dr. Silver testified that Madeline would not have
these impairments Aif her brain
weren=t damaged in some way.@ 








This evidence sufficiently
supports the Morrells= claim for
Madeline=s past medical expenses by establishing that the expenses were
reasonable[35]
and were necessary for Madeline to incur as a result of her brain injury.  Moreover, unless the record demonstrates
otherwise, we must presume that the jury followed the instruction in the court=s charge to only compensate the Morrells for reasonable and necessary
expenses they incurred for the injuries to Madeline.  See Tesfa v. Stewart, 135
S.W.3d 272, 278-79 (Tex. App.CFort Worth 2004, pet. denied); see also Golden Eagle Archery, Inc.
v. Jackson, 116 S.W.3d 757, 771 (Tex. 2003); Turner, Collie &
Braden, Inc. v. Brookhollow, Inc., 642 S.W.2d 160, 167 (Tex. 1982).  The record does not indicate that the jury
disregarded this instruction and awarded unreasonable or unnecessary past
medical expenses.








The jury=s award of $160,000 in past medical expenses is supported by
the evidence and is not so against the great weight and preponderance of the
evidence as to be manifestly unjust.  We
hold that the evidence supporting the jury=s award of past
medical expenses is factually sufficient; we are not at liberty to order a
remittitur.  Larson v. Cactus Util.
Co., 730 S.W.2d 640, 641 (Tex. 1987); Wal‑Mart Stores, Inc. v. Odem,
929 S.W.2d 513, 528 (Tex. App.CSan Antonio 1996,
writ denied) (op. on reh=g). 
We overrule Dr. Finke and the clinic=s fourth issue.

3.  Future Medical Expenses

Defendants claim that the
jury=s award of future medical expenses is excessive because Plaintiffs= expert on future-medical-expenses damages failed to reduce her
damages testimony to present value. 
Alternatively, they seek a remittitur. 
The jury was instructed in special question number 3 to determine A[w]hat sum of money, if paid now in cash, would fairly and reasonably
compensate MADELINE MORRELL for her injures, if any, resulting from the
negligence you have found in answer to Question No. 1 of this charge.@  Item B set forth under special
question 3 instructed the jury to consider,

The reasonable and necessary
expenses for attendant care/custodial care, nursing care, medicine,
institutional care, physical therapy, occupational therapy, speech therapy,
durable medical goods, and transportation that, in reasonable probability
Madeline Morrell will sustain in the future after she reaches the age of
eighteen (18) years.








Virgina Stegent, Plaintiffs= life-care planner, testified that Madeline=s future medical expenses would require between $4.2 million and $5.4
million Ain today=s dollars.@  Defendants= expert testified that the present value of Madeline=s future medical expenses was $1.49 million.  The jury found the present value of Madeline=s future medical expenses to be $3.5 million, an amount that basically
split the difference between Defendants= $1.5 million calculation and Plaintiffs= $5.4 million calculation.

Ms. Stegent=s testimony, provided in terms of Atoday=s dollars,@ does constitute a reduction to present value.  See, e.g., In re Hailey, 792 N.E.2d
851, 861 n.9 (Ind. 2003) (defining present value as the total sum of
future payments based upon the plaintiff's projected life expectancy discounted
to reduce the sum to its value in Atoday's dollars@); Nguyen
v. Los Angeles County Harbor/UCLA Med. Ctr., 48 Cal. Rptr. 2d 301, 309‑10
(Cal. Ct. App. 1995) (same).  Because the
record contains evidence indicating that Madeline would require between $4.2
and $5.4 million in future medical expenses in Atoday=s dollars,@ we overrule Defendants= contention that the Morrells= life-care planner failed to reduce the cost of Madeline=s medical care to present value. 
We likewise decline to order a remittitur because the evidence that
Madeline will require between $4.2 and $5.4 million in future medical expense
is factually sufficient to support the jury=s award of $3.5 million in future medical expenses.  See, e.g., Wal-Mart, 929 S.W.2d at 528
(explaining that appellate court cannot order remittitur when damage evidence
is factually sufficient).

We overrule Dr. Finke and the
clinic=s third issue and the nurses and the hospital=s second issue.








C.  Nurse Fenton=s Joint and Several Liability

In their third issue, the
nurses contend that the trial court=s judgment erroneously imposes joint and several liability on Nurse
Rose Fenton even though the jury found her to be only five percent
proportionately responsible for causing Madeline=s injuries.[36]  The proportionate responsibility statute does
not permit the imposition of joint and several liability upon a party found to
be five percent liable.  See Tex. Civ. Prac. & Rem. Code Ann. ' 33.013 (Vernon 2004).[37]  We sustain the nurses= third issue. 

D. 
Donna and Robert Morrell=s Claim, Individually, Against 

     
the Nurses for Past Medical Expenses

 

In their fourth issue, the
nurses argue that Donna and Robert=s claim, individually, against them for Madeline=s medical expenses is barred by the statute of limitations.  The nurses pleaded the affirmative defense of
limitations and moved for JNOV on the ground that limitations barred this
claim, thus preserving the issue for our review.  See Tex.
R. App. P. 33.1; CDB Software, Inc. v. Kroll, 992 S.W.2d 31, 35
(Tex. App.CHouston [1st
Dist.] 1998, pet. denied).  








1. Standard of Review

A JNOV is proper when a
directed verdict would have been proper. 
See Tex. R. Civ. P.
301; Fort Bend County Drainage Dist. v. Sbrusch, 818 S.W.2d 392, 394
(Tex. 1991); CDB Software, Inc., 992 S.W.2d at 35.  A motion for JNOV should be granted when the
evidence is conclusive and one party is entitled to recover as a matter of law
or when a legal principle precludes recovery. 
Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 227 (Tex. 1990).             2.  Limitations

a.  Parents possess claim for child=s medical expenses








Texas courts have long
recognized that a minor has a well‑defined common law cause of action to
sue for injuries negligently inflicted by others.  Sax v. Votteler, 648 S.W.2d 661, 666
(Tex. 1983) (citing Tex. & P. Ry. Co. v. Morin, 66 Tex. 225, 18 S.W.
503 (1886); Houston & Great N. R.R. Co. v. Miller, 51 Tex. 270
(1879); and Fall v. Webber, 47 S.W.2d 365 (Tex. Civ. App.CDallas 1932, writ ref'd)).  A
child's cause of action, however, is distinctly separate from the parent's
right to recover damages for injuries to his children.  Sax, 648 S.W.2d at 666.  A child may recover damages for pain and
suffering as well as for other damages she may accrue after she reaches the age
of majority.  Id.  Parents, however, possess a cause of
action to recover medical expenses incurred by their minor children through the
date the child attains majority and for the loss of services and earnings of an
unemancipated minor.  Id.; Kennedy
v. Mo. Pac. R. Co., 778 S.W.2d 552, 555 (Tex. App.CBeaumont 1989, writ denied); Kennedy v. Kennedy, 505 S.W.2d
393, 397 (Tex. Civ. App.CAustin 1974,
no writ); Bering Mfg. Co. v. Peterson, 28 Tex. Civ. App. 194, 67 S.W.
133, 135 (Tex. Civ. App. 1902, writ dism'd) (AHistorically, in Texas, the right to recover for medical costs
incurred in behalf of the minor is a cause of action belonging to the parents,
unless such costs are a liability as to the minor's estate.@).

b.  Limitations on parent=s claim








The statute of limitations
governing health care liability claims is two years, except that minors under
the age of twelve have until their fourteenth birthday to file a health care
liability claim or to have one filed on their behalf.  See Tex.
Civ. Prac. & Rem. Code Ann. ' 74.251 (Vernon 2004).  The
Morrells= claim for Madeline=s medical expenses until she reaches the age of eighteen belongs to
them individually; it does not belong to Madeline, and they are not bringing
this claim on her behalf.  See Sax,
648 S.W.2d at 666; Kennedy, 778 S.W.2d at 555; Kennedy, 505
S.W.2d at 397; Bering Mfg. Co., 67 S.W. at 135.  Consequently, the Morrells had two years from
Athe occurrence of the breach or tort or from the date the medical or
health care treatment that is the subject of the claim or the hospitalization
for which the claim is made is completed@ to file suit.  See Tex. Civ. Prac. & Rem. Code Ann. ' 74.251.      Madeline was
delivered on December 31, 1994; the Morrells sued Dr. Finke, the clinic, and
the hospital on August 28, 1996.  On
March 30, 1999, they added as defendants Nurses Fenton, Stephens, and Walker.  Accordingly, because the Morrells did not
assert their claims for Madeline=s medical expenses against Nurses Fenton, Stephens, and Walker until
after limitations had run, the trial court erred by denying the nurses= motion for JNOV on the ground that the Morrells= claims against them were barred by the statute of limitations.  We sustain the nurses= fourth issue.[38]

VI.  Conclusion








Having sustained the nurses= third issue challenging the imposition of joint and several liability
upon Rose Fenton, R.N.C., we modify the judgment by deleting the provisions
imposing joint liability on Nurse Fenton so that her liability is several only,
for five percent of the damages awarded in the judgment.  See Tex.
R. App. P. 43.2(b).  Having
sustained the nurses= fourth
issue claiming that the Morrells= claim against them for Madeline=s past medical expenses is barred by the statute of limitations, we
reverse that portion of the trial court=s judgment imposing liability upon the nurses individually for
Madeline=s past medical expenses.  We
render judgment that the Morrells take nothing from the nurses individually on
their claim for Madeline=s past
medical expenses.  Having overruled the
balance of Defendants= issues and
the Morrells= issues
challenging the JNOV, we affirm the trial court=s judgment in all other respects.

 

 

 

SUE WALKER

JUSTICE

 

EN
BANC

 

GARDNER,
J. filed a dissenting opinion in which CAYCE, C.J. joins.

 

HOLMAN
and MCCOY, JJ. recused.

 

DELIVERED:
November 3, 2005

 











 
 
 
 
 
 
 




 

 

 

 

 

 

                                                COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-01-159-CV

 

 

ROBERT MORRELL AND DONNA                                          APPELLANTS

MORRELL,
INDIVIDUALLY AND AS

NEXT
FRIENDS OF MADELINE MORRELL,

A
MINOR

 

V.

 

MARY ANGELINE FINKE,
M.D., OBSTETRICAL &                       APPELLEES

GYNECOLOGICAL
ASSOCIATES OF ARLINGTON,

ARLINGTON
MEMORIAL HOSPITAL FOUNDATION, 

INC.
D/B/A ARLINGTON MEMORIAL HOSPITAL, ROSE

FENTON,
R.N.C., SANDY STEPHENS, R.N., AND

MARIANNE
WALKER, R.N.

 

 

AND

 

 

MARY ANGELINE FINKE,
M.D. AND OBSTETRICAL &       APPELLANTS 

GYNECOLOGICAL
ASSOCIATES OF ARLINGTON

 

V.

 

ROBERT MORRELL AND DONNA                                             APPELLEES

MORRELL,
INDIVIDUALLY AND AS

NEXT
FRIENDS OF MADELINE MORRELL,

A
MINOR








 

AND

 

ARLINGTON
MEMORIAL HOSPITAL FOUNDATION,                
APPELLANTS

INC.
D/B/A ARLINGTON MEMORIAL HOSPITAL, ROSE

FENTON,
R.N.C., SANDY STEPHENS, R.N., AND

MARIANNE
WALKER, R.N.

 

V.

 

ROBERT MORRELL AND DONNA                                             APPELLEES

MORRELL,
INDIVIDUALLY AND AS

NEXT
FRIENDS OF MADELINE MORRELL,

A
MINOR

 

                                              ------------

 

            FROM
THE 17TH DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                          DISSENTING OPINION

 

                                                       ------------

I respectfully dissent because there is no evidence that
any breach of the standard of care either by the nurses or by Dr. Finke was a
cause-in-fact of Madeline=s injuries.  

DR. FINKE








The majority opinion fails to bridge the Afatal gap@ in the evidence
of cause-in-fact.  Dr. Ater=s opinions on
causation were never linked to any breach of the standard of care by Dr. Finke
as testified to by Dr. Rice.  The opinion
of Dr. Rice was that Dr. Finke was negligent in failing to decide on a
C-section by 7:27 p.m. with delivery by 7:35 p.m.  But Dr. Ater testified that all of Madeline=s injuries
occurred during the ten or fifteen-minute period of the forceps delivery and
were proximately caused by the trauma of the forceps delivery, combined with
cumulative hypoxic-ischemic insults that had been occurring throughout the
afternoon.[1]

Despite the majority=s efforts to
interweave the opinions of Plaintiffs= experts on
standard of care and causation into a consistent theory, those experts were Aships that passed
in the night@[2] that never spoke
in passing.  it is not our role as a
reviewing court to Aborrow from each expert pieces of opinion
that seem to match, tie them together in an ill-fitting theory . . . and then
argue that this is some evidence to support the verdict.@  Gen. Motors Corp. v. Iracheta, 161
S.W.3d 462, 472 (Tex. 2005).  I believe
the majority has done just that. 








Neither Dr. Rice nor Dr. Ater testified that, if Dr. Finke
had delivered Madeline by C-section in the time frame of 7:27 p.m. to 7:35
p.m., all or even some of Madeline=s injuries would
have been prevented.  Dr. Ater only said
that he believed Madeline Awould have done a
lot better if they could have delivered her by a C-section right then.@  That opinion does not tell us whether a
C-section would have avoided all or some or any of Madeline=s injuries.  Dr. Ater=s speculative and
conclusory opinion is not competent evidence that Dr. Finke=s negligence was a
substantial factor without which Madeline would not have suffered the
neurological injuries and damages that she ultimately sustained.  Park Place Hosp. v. Estate of Milo, 909
S.W.2d 508, 511 (Tex. 1995) (holding medical testimony failing to establish
more than fifty percent chance of recovery but for negligence not legally
sufficient to establish causation); Bradley v. Rogers, 879 S.W.2d 947,
955-56 (Tex. App.CHouston [14th Dist.] 1994, writ denied)
(characterizing opinion that a patient presenting as claimants did generally
will be Abe better off@ if surgery is not
delayed as speculation and no evidence of proximate cause).

The majority also incorrectly characterizes Dr. Rice=s opinion
testimony. According to the majority, Dr. Rice opined that Afrom 7:27 onward,
Madeline was so >stressed= that the standard
of care from that point forward >absolutely= required a
C-section to avoid further stressing her through a vaginal delivery.@ This is not what
he said.  Instead, he agreed only
generally that stress related to a problem with the umbilical cord is a reason
for a physician to avoid a forceps delivery and that a forceps delivery would
not have been appropriate at 7:27 p.m., while Madeline was at Azero@ station.  Dr. Rice explained that there Awould be a very
high chance at this high station@ that Madeline
would not be able to tolerate Athis difficult of
a forceps delivery.@ 
[Emphasis added.]  He never
addressed whether the forceps delivery was appropriate at the plus two station,
where Dr. Finke testified the baby=s head had
descended when she proceeded with the forceps delivery at 7:50 p.m.








The experts agreed that the cause of variable and late
decels such as those noted on the fetal monitor strip was compression of the
umbilical cord, indicating reduction in the supply of oxygen to the baby or Ahypoxia.@  Additionally, it was undisputed that the
forceps delivery was Atraumatic,@ with the baby in
the difficult OP (face-up) position and the sudden development of the
life-threatening condition of shoulder dystocia.  None of those conditions was attributed by
any expert to any negligence of any of the defendants.  And while Dr. Ater testified that all of
Madeline=s injuries
occurred during the Atraumatic forceps delivery,@ he did not say
nor did any other expert testify that Madeline=s injuries were
caused by a breach of the standard of care in the forceps delivery.  

To summarize, while there is evidence that Dr. Finke
deviated from the applicable standard of care in failing to perform a timely
C-section by 7:27 p.m., there is no evidence that her failure to perform a
timely C-section was a cause-in-fact of Madeline=s injuries.  The only competent expert testimony
establishing the cause of Madeline=s injuries is the
opinion of Dr. Ater that they were caused during the forceps delivery.  Yet, no expert testified that Dr. Finke
breached the standard of care for performing a forceps delivery.








Consequently, there is no evidence supporting the essential
Alink@ in the causal
chain between any conduct of Dr. Finke for which there is evidence of
negligence and the injuries suffered by Madeline.  See, e.g., Roark v. Allen, 633 S.W.2d 804,
811 (Tex. 1982) (holding that, although there was evidence of breach of the
standard of care by defendant physician in delivering the baby by forceps,
there was no evidence of proximate cause where plaintiffs= expert testified
only that baby=s skull was fractured Aas a result of the
forceps slipping@ but no expert testified that improper
application of the forceps caused them to slip, so that a jury could not infer,
from that evidence alone, the cause of the forceps slipping); see also
Arlington Mem=l Hosp. Found., Inc. v. Baird, 991 S.W.2d 918,
922-23 (Tex. App.CFort Worth1999, pet. denied) (reversing
judgment against hospital based on negligence in allowing reuse of Aphaco tip@ absent expert
testimony that negligence in allowing such reuse was cause of corneal burn); Duff
v. Yelin, 751 S.W.2d 175, 177 (Tex. 1988) (holding evidence patient suffered
nerve injury insufficient absent proof injury caused by improper positioning
during surgery).  Therefore, I would hold
that there is no evidence of cause-in-fact as to Dr. Finke.   

                                                    THE
NURSES

Contrary to the majority=s conclusion that
there was Adirect@ medical testimony
of causation as to the nurses= negligence, the
trial court sustained defense objections to testimony on causation from Nurse
LaMont, the only expert Plaintiffs offered on causation as to negligence of the
nurses.  While I agree with the majority
that Dr. Ater could have testified regarding cause-in-fact as to the
nurses= negligence, the
fact is that he did not.  The only expert
testimony was to the contrary, from Dr. VanDorsten and Dr. Finke C that the nurses= conduct was not
a proximate cause of Madeline=s injuries. 

The majority opinion combines Nurse LaMont=s testimony
regarding numerous breaches of the nursing standard of care with Dr. Ater=s testimony that
continued, worsening hypoxic-ischemic insults throughout the day Aset up@  Madeline for PVL.  But there was no expert opinion connecting
the continued, worsening hypoxic-ischemic insults to any breaches of the nurses= standard of
care.  








The majority=s holding that the
jury could find causation from the nurses= negligence absent
expert opinion or a traceable chain of causation is necessarily a holding that
the lay jury could infer the essential causal link on the basis of general
experience and common sense.  See
Lenger v. Physician's Gen. Hosp., Inc., 455 S.W.2d 703, 708 (Tex. 1970)
(limiting instances where lay inference may properly be allowed to determine
causation).  I disagree that this is such
a case where the causal link may be established absent direct expert opinion or
guiding scientific principles established by expert testimony.  The only testimony
of the experts was contrary to any such inference.  

Plaintiffs have not even argued the theory advanced by the majority.[1]  Their argument on appeal is that the nurses
caused Madeline=s injuries, not by allowing hypoxia to
develop during labor so as to cause Madeline to be Aset up,@ but by failing
to prevent the forceps delivery. 
Plaintiffs contend that the nurses should have notified Dr. Finke of the
7:15 p.m. decel under the theory that Dr. Finke would then have decided to
perform a C-section by 7:27 p.m., so that there would have been no forceps
delivery and, consequently, no permanent neurological injuries.  But there is no evidence that the nurses= failure to notify
Dr. Finke of the 7:15 p.m. decel caused or contributed to her decision by 7:27
p.m. not to perform a C-section.  In
fact, Dr. Finke=s testimony to the contrary, that she
would not have made the decision to perform a C-section at 7:27 p.m., is
undisputed. 








Any negligence of the nurses in failing to recognize and
take action on the baby=s hypoxic events or to notify Dr. Finke of
the critical 7:15 p.m decel was too remote and attenuated by Dr. Finke=s independent
decision.[2]
 See, e.g., Wyeth-Ayerst Labs. v.
Medrano, 28 S.W.3d 87, 95 (Tex. App.CTexarkana 2000, no
pet.) (holding plaintiff failed, as matter of law, to prove lack of adequate
information from manufacturer of Norplant caused her injuries where nurse
practitioner testified that information would not have affected her decision to
prescribe contraceptive to plaintiff); Thomas v. Hoffman-LaRoche, Inc.,
949 F.2d 806, 817-18 (5th Cir. 1992) (applying Mississippi law) (holding
regardless of plaintiff=s expert=s opinion that
reasonable physician would not have prescribed drug if earlier adequate warning
had been given, Aundisputed historical evidence@ that no physician
changed his or her practice after adequate information was released by
manufacturer precluded reasonable possibility that adequate warning would have
prevented plaintiff=s injury, and possibility that defendant
physician would not have prescribed drug too remote to raise issue of fact as
to causation).








The overarching question with respect to the nurses= liability is
whether some evidence establishes a reasonable medical probability that one or
more specific breaches of the standard of care by the nurses alleged and proved
was a Asubstantial factor@ in bringing about
Madeline=s injuries, and Awithout which her
injuries would not have occurred.@  See Lear Siegler, Inc. v. Perez,
819 S.W.2d 470, 472 (Tex. 1991); see also Doe v. Boys Clubs of Greater
Dallas, Inc., 907 S.W.2d 472, 477 (Tex. 1995).  Any negligence of the nurses was too
attenuated from the resulting injuries to be a substantial factor without which
the injuries would not have occurred.  

Plaintiffs= theory, as
accepted by the majority, is that if there had been a C-section delivery then
there would have been no forceps delivery and, hence, no birth trauma.  This is not enough.  AIn order to be
[the proximate cause] of another=s harm, it is not
enough that the harm would not have occurred had the actor not been negligent.
. . . [T]his is necessary, but is not of itself sufficient.  The negligence must also be a substantial
factor in bringing about the plaintiff=s harm.@  (emphasis added.)  IHS Cedars Treatment Ctr. of DeSoto v.
Mason, 143 S.W.3d 794, 799 (Tex. 2004) (quoting Restatement (Second) of Torts ' 431, cmt. a
(1965)); see also Union Pump Co. v. Allbritton, 898 S.W.2d 773, 775
(Tex. 1995); Lear Siegler, Inc., 819 S.W.2d at 472.[3]


To sum up, there is no evidence in this case that if the
nurses had acted differently, the result would have been different.  See Lenger, 455 S.W.2d at
706.  Absent such evidence, the jury was
left to speculate that the nurses= conduct caused
Madeline=s injuries.  See id.  I would hold, therefore, that there is
legally insufficient evidence that any negligence of the nurses was a
cause-in-fact of Madeline=s injuries and damages. 

 








                                                   CONCLUSION

Our sympathies are naturally with this family who must live
with the tragedy and burdens of a child with cerebral palsy and mental
retardation.  But it is not for this
court, under the guise of the deferential standard of review favoring the jury=s findings, to
re-invent the case that was tried.  The
record compels the conclusion that there is legally insufficient evidence to
support the jury=s finding of causation as to any
negligence of the nurses or Dr. Finke. 
Consequently, I would reverse and render judgment that Appellants and
Cross-Appellees Robert and Donna Morrell, individually, and as next friends for
the minor daughter, Madeline Morrell, take nothing against all defendants. 

 

 

ANNE GARDNER

JUSTICE

 

CAYCE, C.J., joins.  

 

DELIVERED: November 3, 2005











[1]Because all parties to the trial
court judgment have perfected appeals to this court all parties are both
appellants and appellees.  See Tex. R. App. P. 26.1(d).  Accordingly, for clarity we sometimes refer
to the parties by their trial court status as Plaintiffs and Defendants or by
their name or entity, i.e., clinic, nurses, or hospital. 





[2]Defendants all testified that they
possessed no independent recollection of Donna=s labor or of Madeline=s birth; they testified as to what
their usual practice would have been.





[3]The American Organization of Nurse
Executives.





[4]See Cruz v. Paso del Norte Health
Found., 44 S.W.3d
622, 625 (Tex. App.CEl Paso 2001, pet. denied)
(providing similar description from expert testimony in case involving
obstetrical medical malpractice claim).  






[5]A fact issue arose at trial as to
whether Dr. Finke actually examined Donna prior to making this 4:50 p.m.
progress note; Dr. Finke testified that her customary practice would have been
to examine Donna prior to making the note, but she conceded that she could have
made the note based on information the nurses provided to her without actually
examining Donna.   





[6]Nurse Fenton was the charge nurse
in the hospital=s labor and delivery unit until
7:00 p.m. that night; Nurse Sandy Stephens was the charge nurse from 7:00 p.m.
through 7:00 a.m. the next morning. 





[7]See VandeStreek v. Hammer, No. 03-99-00355-CV, 2000 WL
963162, at *2 (Tex. App.CAustin July 13, 2000, no pet.) (not
designated for publication) (discussing shoulder dystocia as well as McRoberts
maneuver and suprapubic pressure).





[8]The accuracy of this pH was hotly
contested. 





[9]Nurse Walker explained that A[a]gonal respirations would be
gasping.@





[10]Dr.
Tisdell said that acidotic means that there is some acid build up in the
bloodstream. 





[11]The nurses do not challenge the
sufficiency of the evidence to establish these breaches of the standard of care
or to establish the foreseeability element of proximate cause.  The nurses challenge only the sufficiency of
the evidence concerning the cause-in-fact element of proximate cause explicitly
found by the jury in its negligence findings against them.





[12]Dr.
Ater explained that Aischemic@ refers to inadequate blood flow
leading to hypoxia in the tissue.  AEncephalopathy@ is injury to the brain cells.  The Aperiventricular@ area is the area next to one of the ventricles of the
brain.  AMalacia@ means abnormal development.  





[13]Dr. Ater testified for three
days.  His testimony is set forth in four
volumes of the reporter=s record.  Dr. Ater explained in depthCthrough slides presented to the
juryCthe increasingly severe physical
impact of the hypoxic insults suffered by Madeline throughout labor and
delivery and the physical consequences of Madeline=s loss of fetal reserves on her
body, organs, and brain. 





[14]Dr. Ater testified that a
subclinical infection is an infection that Acomes and goes and their immune system deals with it and
they don=t have any clinical signs of that
infection.@ 
He said that Madeline obviously did have clinical signs and symptomsCwhich are documented in her NICU records,
and which are the reason cultures were performedCso that by definition she did not
have a Asubclinical infection.@





[15]A fact issue, discussed supra,
arose at trial concerning whether this pH result from the blood obtained by Dr.
Finke was accurate.





[16]AAsphyxia@ is tissue damage that occurs when
the cell processes break down from lack of oxygen-producing lactic acid (Aacidosis@). 





[17]The hospital=s policies categorize a pH of 7.21
or lower as acidotic.  Dr. VanDorsten
testified that this pH standard is Aarchaic,@ said that it Adoesn=t represent modern science,@ and said that the jury should
disregard it. 





[18]At five minutes of age, Madeline=s heart rate was above 100 beats
per minute, so Nurse Walker scored her two. 
Madeline had Asome attempts@ at breathing, so she received one
point for respiratory effort.  She
received one point for muscle tone, one point for reflex, and one point for
skin color.





[19]Increased oxygenation improves pH,
raises it. 





[20]The clinic joins Dr. Finke in
appealing from the judgment.  Because the
clinic was held liable only under the doctrine of respondeat superior and
its liability is contingent upon that of Dr. Finke, for simplicity we will
refer only to her in our discussion.





[21]Because the record supports the
jury=s negligence and proximate cause
findings concerning this alleged breach of the standard of care, we do not
address the other breaches alleged by Plaintiffs to alternatively support the
jury=s findings.  We do not address whether Dr. Finke breached
the standard of care in the way she performed the forceps delivery, as the
dissent apparently believes; because the standard of care required a C-section,
no vaginal delivery should have been performed at all.





[22]Dr. Finke objected to this
testimony on the ground that Dr. Ater was not qualified to testify concerning
the standard of care for an obstetrician. 
The trial court overruled the objection. 
But we do not consider this testimony as standard of care evidence, only
as causation evidence.  





[23]Dr. Ater provided this testimony on
direct examination, before any cross-examination when the dissent contends he
purportedly learned of Dr. Rice=s opinions.





[24]This is not, as the dissent
asserts, an inference of causation; it is direct medical expert causation
evidence.





[25]Citing General Motors v.
Iracheta, the dissent contends that we have strung together pieces of
unmatched expert opinion testimony linking the breach-of-the-standard-of-care
expert testimony concerning Dr. Finke with the expert causation testimony
concerning Dr. Finke.  161 S.W.3d 462,
469-70 (Tex. 2005).  A plaintiff is
allowed, however, to utilize different experts to establish standard of care,
breach, and causation.  See, e.g., Tex. Civ. Prac. & Rem Code
74.351(I) (Vernon Supp. 2004-05) (permitting different expert reports on
liability and causation).  This is not a
case like Iracheta where fatally conflicting causation testimony exists
by the plaintiff=s two causation experts.  See Iracheta, 161 S.W.3d at 469-70
(recognizing plaintiff=s expert Eduardo Sanchez=s causation testimony conflicted
irreconcilably with plaintiff=s expert John Stilson=s causation testimony). 
Dr. Rice testified as to the standard of care and Dr. Finke=s breach of that standardCthe failure to perform a C-sectionCwhile Dr. Ater testified that a
proximate cause of Madeline=s injuries was the failure to perform a C-section.  





[26]Because the dissent asserts that we
have incorrectly characterized Dr. Rice=s  testimony, we set
forth below one specific, pertinent question and answer exchange:

 

Q. 
For a baby that=s been stressed as you=ve been showing us through here
[the fetal heart monitor strip up to 7:27 p.m.], would that be one of the
reasons to avoid adding more stress through a vaginal delivery?

 

A. 
Absolutely.  Absolutely.

 

Q. 
And would standard of care require the physician to make that decision?

 

A. 
Yes.

 

Q. 
Now, Doctor, we=re up here to 7:30 [p.m. on the
fetal heart monitor strip] . . .

 

This testimony, as well as other
testimony by Dr. Rice, clearly supports the sentence in our opinion that the
dissent claims to be an incorrect characterization of Dr. Rice=s testimony: ABut
Dr. Rice testified that from 7:27 p.m. onward, Madeline was so >stressed= that
the standard of care from that point forward >absolutely=
required a C-section to avoid further stressing her through a vaginal delivery.@  The dissent superimposes its own view of the
evidence on this testimony and apparently contends that by simply waiting until
7:50 p.m. to prepare for a vaginal forceps delivery Dr. Finke=s decision to perform a vaginal
forceps delivery somehow became not a breach of the standard of care. 





[27]The hospital joins in this issue
presented by the nurses.  Because the
hospital=s liability under this issue is
contingent upon the nurses= liability, for simplicity we will refer only to the nurses
in our discussion of the sufficiency of the evidence to support the
cause-in-fact element of the jury=s negligence findings against the nurses.





[28]The jury could have based its
negligence findings concerning the nurses on any of these unchallenged breaches
of the standard of care.  See, e.g.,
Dillard v. Tex. Elec. Co-op, 157 S.W.3d 429, 434 (Tex. 2005) (recognizing
that in broad form negligence question Ajurors need not agree on every detail of what occurred so
long as they agree on the legally relevant result@). 
But because the record supports the jury=s findings that each of the
following unchallenged breaches of the standard of careCfailure
to accurately assess the fetal heart monitor strip, failure to accurately
intervene based on the problems documented on the strip, and the failure to
provide timely care to Donna, including the failure to prepare Donna for a
C-sectionCwere
a cause-in-fact of
Madeline=s brain injury, we do not address
the sufficiency of the evidence concerning the remaining unchallenged breaches
of the standard of care.





[29]The dissent concludes that the jury
could consider Dr. Ater=s causation testimony only in
conjunction with Dr. Finke=s negligence, not in conjunction with the nurses= negligence.  But a medical doctor may testify concerning
causation from a breach of the nursing standard of care.  Accord Columbia Med. Ctr. of Las Colinas
v. Bush ex rel. Bush, 122 S.W.3d 835, 851 (Tex. App.CFort Worth 2003, pet. denied)
(recognizing doctor testified for defense on nursing and paramedic standards of
care).

 

Ironically, here, the nurses= trial counsel objected to the
causation testimony of Plaintiffs= nursing expert, Nurse LaMont; he argued that only a
medical doctor, like Dr. Ater, should be permitted to testify concerning
causation.  The trial court sustained
this objection and excluded Nurse LaMont=s causation testimony. 
Because the nurses objected to causation testimony from a nurse, arguing
that only a physician could provide causation testimony, they cannot now argue
that Plaintiffs= evidence is insufficient because
causation testimony from a nurse was required. 
See, e.g., Gen. Chem. Corp. v. De La Lastra, 852 S.W.2d 916, 920
(Tex.) (parties may not invite error by requesting trial court action and then
complaining that very action is erroneous), cert. dism'd, 510 U.S. 985
(1993).  The dissent=s analysis would allow the nurses
to do just that.

 

Finally, the dissent
asserts that we are addressing a theory of causation as to the nurses that is
not advanced by the Morrells on appeal. 
The jury=s findings of standard of care
breaches by the nurses are unchallenged. 
Unchallenged fact findings are binding on this court.  See, e.g., Bedford v. Moore, 166
S.W.3d 454, 466 (Tex. App.CFort Worth 2005, no pet.)
(Cayce, C.J., concurring) (stating that an unchallenged jury finding is binding
on appellants); Hotel
Partners v. KPMG Peat Marwick, 847 S.W.2d 630, 632 (Tex. App.CDallas 1993, writ denied) (same); see
also McGalliard v. Kuhlmann, 722
S.W.2d 694, 696 (Tex. 1986) (unchallenged finding of fact is binding on
appellants).  And the jury could have based its
cause-in-fact finding on any of the unchallenged standard of care breaches
testified to by Nurse LaMont.  Yet the
dissent would hold that these unchallenged standard of care breaches will not
support a cause-in-fact finding because the Morrells (as Appellees) purportedly
failed to brief them.  The Morrells do
not bear the burden on appeal of establishing the sufficiency of the evidence;
the nurses bear the burden of showing the insufficiency of the evidence.  The cases cited by the dissent do not hold
otherwise.





[30]The dissent apparently would
require evidence that the nurses= standard of care breaches were the cause-in-fact of
Madeline=s hypoxic ischemic insults. 





[31]We
have thoroughlyCin
the previous sixty-four pages of this slip opinionCdetailed
the evidence contained in the forty-three volumes of reporter=s
record from this five week jury trial involving sixteen expert witnesses.  Consequently, we are flabbergasted by the
dissent=s
contention that setting forth facts and testimony reflected in this recordCreplete
with numerous quotesCsomehow
constitutes a Are-invention@ of
the case tried to the jury.  Nor do we
understand the dissent=s
criticism of our opinion for applying the proper, deferential standard of
review.    





[32]Specifically, Defendants claim that
remand is required A[b]ecause the Morrells adduced no
evidence that would enable a lay jury to distinguish Madeline=s probable future medical expenses
caused by Dr. Finke=s alleged negligence from those
that she would have incurred anyway because of the prior hypoxic events.@





[33]The standard of review for an
excessive damages complaint is factual sufficiency of the evidence.  See Mar. Overseas Corp., 971 S.W.2d at
406.





[34]Treatment planning,@ according to Dr. Silver, means
making recommendations, based on test results, of the types of therapies
needed. 





[35]The record reflects that Madeline
received her therapy at the hospital; the hospital is not contending that the
amount it billed the Morrells was not reasonable.





[36]The Morrells concede this issue.





[37]Neither the pre-1995 version of the
statute nor the post-1995 version of the statute authorize joint and several
liability against a five percent liable tortfeasor.  Consequently, for purposes of this issue, we
do not differentiate between these two versions of the statute.





[38]The hospital was timely sued and
remains jointly and severally liable as set forth in the judgment for this
element of damages. 





[1]Dr.
Ater testified on causation before Dr. Rice testified on the standard of care
as to Dr. Finke.  Neither expert heard
the testimony of the other.  Dr. Ater
admitted that he was not even aware of Dr. Rice=s
opinions until they wereopinion that it was Dr. Finke=s
failure to perform a C-section by 7:27 p.m. that breached the medical standard
of care until that was pointed out to him on cross-examination.





[2]From AThe Theologian=s Tale,@ by Henry Wadsworth Longfellow.





[1]Plaintiffs abandoned any claim on
appeal that negligence of the nurses caused Madeline=s injuries byIn their original
brief as appellants, the nurses raised complaints of no evidence of causation
regarding the claims of negligence now relied upon by the majority, including
failing to chart events occurring during labor and delivery or by failing to
intervene with appropriate measures during labor.  Plaintiffs did not respond to those arguments
but, instead, focused in this court solely on the theory that the nurses failed
to prevent the forceps delivery. 
Plaintiffs have thus abandoned their theories of liability based upon
the grounds of negligence urged by the majority.  See Wells Fargo Bank Tex., N.A. v. Barton,
100 S.W.3d 455, 458 (Tex. App.CSan Antonio 2003, no pet.); In re J.G.W., 54 S.W.3d
826, 832 (Tex. App.CTexarkana 2001, no pet.).    





[2]Although Nurse LaMont testified
that the nurses should have Apushed@ Dr. Finke into a decision, Plaintiffs concede they are not
contending that the nurses should have insisted that Dr. Finke perform a
C-section, rather than proceeding to a forceps vaginal delivery.  Indeed, Nurse LaMont admitted she was not
suggesting that they should have told Dr. Finke what decision to make.





[3]The Restatement uses the word Acause@ in Athe popular sense, in which there
always lurks the idea of responsibility, rather than in the so-called >philosophic sense,= which includes every one of the
great number of events without which any happening would not have
occurred.  Each of these events is a
cause in the so-called >philosophic sense,= yet the effect of many of them is
so insignificant that no ordinary mind would think of them as causes.@ 
Lear Siegler, Inc., 819 S.W.2d at 472 (quoting from Restatement( second) of torts, ' 431, cmt. a).